UNITED STATES of America

v.

**Mitchell Frederick PASTER.**

No. 4:CR–96–221.

United States District Court,
M.D. Pennsylvania.

April 21, 1998.

---

Wayne P. Samuelson, Williamsport, PA, for Plaintiff.

George E. Lepley, Jr., Kyle W. Rude, Williamsport, PA, for Defendant.

*OPINION*

MUIR, District Judge.

## I.   INTRODUCTION

On August 28, 1996, Defendant Mitchell F. Paster was charged in a one-count indictment with first degree murder, a violation of 18 U.S.C. § 1111. On November 19, 1997, Paster entered a plea of guilty to second

degree murder. Second degree murder is a lesser included offense under the same statute. On February 4, 1998, a presentence report and an addendum were submitted to the court. On February 25, 1998, a second addendum and a presentence report with corresponding revisions were submitted.

On February 4, 1998, the Government filed a motion for upward departures based upon the following Sentencing Guidelines: (1) Section 5K2.8—Extreme Conduct, (2) Section 5K2.0—Premeditation and (3) Section 5K2.6—Weapons and Dangerous Instrumentalities.

Paster challenged the upward adjustment to the guideline imprisonment range calculated by the Probation Officer for obstruction of justice and challenged the lack of adjustment for acceptance of responsibility. Paster also "challenge[d] the upward departures for Extreme Conduct and Grounds for Departure § 5K2.0 [and] the lack of downward departure...for Aberrant Behavior and Victim's Conduct." Although no motions for downward departures were filed by counsel for Paster, we will treat the downward departure "challenges" by defense counsel as if appropriate motions for downward departures had been filed.

On February 9, 1998, a pre-sentence conference was held and on February 12, 1998, we issued an order which set forth a briefing schedule for Paster's objections to the presentence report, his challenges as to downward departures and the Government's motion for upward departures. Those matters have been fully briefed. We held a hearing regarding the same on March 18 and 19, 1998.

The following are the Court's findings of fact, discussion, recapitulation as to guidelines calculations and conclusions of law with respect to Paster's objections to the presentence report, his challenges as to downward departures and the Government's motion for upward departures.

## II. FINDINGS OF FACT

1. On August 16, 1996, Paster was arrested for the murder of his wife, Margaret Bostrom, at their home on the United States Penitentiary–Lewisburg.

2. On August 28, 1998, a Grand Jury sitting in Williamsport returned a one count indictment charging Paster with First Degree Murder in violation of 18 U.S.C. §§ 7(3) and 1111. (Undisputed, hereinafter "U")

3. Counsel for the Government had attempted to obtain permission to seek the death penalty as a possible sentence. (U)

4. The testimony of Paster during the November 22, 1996 suppression hearing was inaccurate.

5. On November 19, 1997, Paster entered a plea of guilty to Murder in the Second Degree, a lesser included offense of the Indictment. (U)

6. On March 18 and 19, 1998, a presentence hearing was held before the undersigned, concerning the issues of downward adjustments and departures sought by Paster and upward adjustments and departures requested by the Government. (U)

7. During the telephone call to his mother after the murder, Paster was extremely upset when he informed her that "something terrible has happened, I stabbed Margaret." (U)

8. The actual telephone call with Paster's mother was less than one minute as she became hysterical and her boss, Mr. Sauver, had to take the telephone call. Mr. Sauver told Paster to call "911" immediately and terminated the telephone call. (U)

9. Paster immediately and at approximately 11:10 a.m. on August 16, 1996 contacted the "911" operator, reported that he had stabbed his wife and requested medical assistance for his wife.

10. Paster provided his name, address, directions to his home and the location of the murder weapon. Paster remained on the telephone with the "911" operator until personnel from the Bureau of Prisons and the Union County Emergency Medical Services arrived.

11. On the "911" audiotape with the Union County telecommunicator, Paster's first words are unintelligible.

12. Paster was extremely upset on the telephone, repeatedly sobbing and saying "Oh my God" and requesting the Emergency Medical Service personnel to help his wife. (U)

13. Paster cooperated with the personnel from the Bureau of Prisons and was detained in his home for approximately four (4) hours while the crime scene was investigated. (U)

14. While detained Paster was at times very upset, crying and shaking, and was often times despondent. (U)

15. When interrogated by agents from the Federal Bureau of Investigation on August 16, 1996, Paster was unable to remember many of the details of the murder.

16. When interviewed by FBI agents, Paster told the agents that while in the kitchen downstairs, he took a knife which was silver in color with a black handle from the butcher block and started upstairs with the knife as his wife was getting out of the shower.

17. Paster's testimony at the sentencing hearing that he did not tell the agents that he got a knife from the kitchen and started upstairs with it is not credible.

18. Paster initially told the agents that he did not remember what happened upstairs. (U)

19. When questioned further by the agents, Paster told them that he did not want to talk about what happened upstairs nor did he remember what happened upstairs.

20. Hours earlier in his conversation with the Union County "911" operator, Paster, in response to questions by the operator, said that he stabbed his wife in the chest. (U)

21. Hours earlier in his conversation with the Union County "911" operator, Paster informed the operator that the knife was in the sink downstairs. (U)

22. When interviewed by FBI agents, Paster told the agents that he believed he put the knife in the kitchen sink because he heard later that that is where the knife was found.

23. Up until a few minutes prior to the stabbing, Paster had no plan to kill his wife.

24. Dr. Samuel Land conducted the autopsy on Margaret Bostrom on August 17, 1996. (U)

25. Dr. Land is a medical doctor specializing in forensic pathology, and has testified as an expert in this field in approximately 100 cases. (U)

26. Dr. Land has conducted approximately 1500 autopsies with approximately 300 of them being homicide cases, including 65–75 stabbing cases. (U)

27. Dr. Land concluded that Margaret Bostrom died of multiple stab wounds to various vital organs of her body. (U)

28. Paster stabbed his wife sixteen times as she was leaving the shower, including numerous slashing wounds which are defensive wounds.

29. Of the 16 stab wounds suffered by her, 10, listed as B–J and L of his autopsy report, were considered immediately life threatening. (U)

30. The stab wounds included 8–9 penetrations of the heart area. (U)

31. The victim also suffered numerous defensive wounds to her hands, arms, and leg, including having one finger almost severed. (U)

32. Dr. Land could not rule out the possibility that one stab wound may have also caused a defensive wound. (U)

33. The victim suffered one stab wound which penetrated thru her body. The knife also completely penetrated a floor tile.

34. Dr. Land had never previously seen the type of injury specified in the preceding paragraph.

35. Margaret Bostrom also suffered wounds which completely penetrated her sternum, one of the hardest bones in the body. (U)

36. Dr. Land concluded that the victim was still alive during the infliction of all the wounds because hemorrhaging existed around all of the wounds. (U)

37. All of the stab wounds to the torso of the decedent were immediately fatal causing

the decedent's death within minutes of the last stab wound. (U)

38. In Dr. Land's opinion an excessive amount of force was used in murdering Margaret Bostrom based upon: (a) the use of a knife; (b) the excessive number of wounds suffered by the victim throughout her body; and (c) the depth of the penetration of the wounds.

39. Dr. Land concluded that Margaret Bostrom suffered an extremely violent death and he considered it to be the most severely violent death he had ever seen.

40. Dr. Land characterized the stabbing as a violent act with considerable struggle by the decedent. (U)

41. Dr. Land concluded that based on the cumulative damage inflicted upon Margaret Bostrom, it was highly unlikely she would have survived had she been on an operating room table in the best hospital in the country as the last wound was inflicted. (U)

42. Viewing the totality of the circumstances, Paster's conduct was unusually heinous and brutal.

43. Paster has never denied that he stabbed and killed his wife.

44. Paster, through his counsel, sought psychiatric and hypnotic evaluations in an effort to restore his memory loss. Paster was evaluated by Robert L. Sadoff, M.D. for the defense and Sally Johnson, M.D. for the Government. (U)

45. After the completion of the psychiatric evaluations and receipt of the reports, Paster, through his counsel, offered to enter a guilty plea to manslaughter. This offer was rejected by the Government. (U)

46. Several days prior to scheduled jury selection in this matter, counsel for the Government offered Paster the opportunity of entering a guilty plea to second degree murder which Paster accepted after speaking with his parents and after the jury was selected.

47. Paster has no prior history of violence and has a reputation in the community for being peaceable, nonviolent, and law abiding. (U)

48. Although Paster discovered his wife was having an affair with Dr. William Corey, his wife's co-worker, Paster did not act out violently but rather left the marital residence to live with his parents on two occasions. (U)

49. Paster did not act violently when confronted by Dr. Corey about the affair and Paster did not strike Dr. Corey when offered the opportunity by Dr. Corey to do so. Instead Paster directed Dr. Corey to leave Paster's house.

50. Dr. Sadoff, who was retained by Paster, has offered the opinion that Paster "lost control during a heat of passion with adequate provocation by his wife." Dr. Sadoff also opined that this "outward explosion of violence is atypical and foreign for Mitchell Paster." (U)

## III. DISCUSSION

### A. Departure Issues

■ The Government seeks an upward departure from the Sentencing Guidelines' imprisonment range pursuant to Section 5K2.8 for extreme conduct. That section provides:

> If the defendant's conduct was unusually heinous, cruel, brutal or degrading to the victim, the court may increase the sentence above the guideline range to reflect the nature of the conduct. Examples of extreme conduct include torture of a victim, gratuitous infliction of injury, or prolonging of pain or humiliation.

Paster stabbed his wife sixteen times with a butcher knife. Her heart was penetrated eight or nine times. Ten of the stab wounds were immediately life threatening. One of those stab wounds penetrated her body and completely penetrated a floor tile. Paster also slashed the victim with eleven incising wounds. Dr. Land, the pathologist who conducted an autopsy on the victim, described those incising wounds as "defensive". He considered her death to be the most violent one he had ever encountered in his extensive experience. The pictures of the victim graphically demonstrate the heinous and extreme nature of Paster's crime. There were many stabbings of vital areas of the victim's body and many defensive wounds on her hands

and arms. An upward departure based upon Paster's unusually heinous, cruel, and brutal conduct is warranted.

We next consider the appropriate level of upward departure for Paster's extreme conduct. There are no provisions in the guidelines which suggest an analogy from which to determine the appropriate level of upward departure. In *United States v. Kikumura*, 918 F.2d 1084, 1113 (3d Cir.1990), the Court of Appeals for the Third Circuit upheld a five level upward departure for a defendant who had manufactured home-made bombs for detonation in the submarine automobile tunnel from New Jersey to New York City. In *United States v. Herrera*, 70 F.3d 444 (7th Cir.1995), a five level increase was upheld for a defendant who had brutally assaulted his wife for cooperating with authorities in a drug investigation. In *United States v. Pergola*, 930 F.2d 216 (2d Cir.1991), a ten level increase was upheld for a defendant who mailed threatening letters to his ex-girlfriend and in *United States v. Roberson*, 872 F.2d 597 (5th Cir.1989), an eleven level increase was approved for extreme conduct in burning a corpse in connection with a credit card offense. We consider that a nine level upward departure for Paster's extremely brutal conduct is warranted.

■ The Government also requests an upward departure from the United States Sentencing Guidelines' imprisonment range based upon Section 5K2.0 for premeditation. That section provides that a court may depart if it finds "an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines." The Government argues that, if the court finds that the offense was premeditated, a departure is appropriate because the guidelines for second degree murder provide no adjustment in offense level for cases in which premeditation is present and thus premeditation places the offense outside the heartland of second degree murder cases.

■ Murder is the unlawful killing of a human being with malice aforethought. 18 U.S.C. § 1111(a). First degree murder is "perpetrated by...premeditated killing..." *Id.* Second degree murder is any murder

which does not fall under the definition of first degree murder. *Id.* Premeditation is the only distinguishing factor between the two crimes. *United States v. Kelly*, 1 F.3d 1137, 1141 (10th Cir.1993). The offense level for first degree murder is 43 and the offense level for second degree murder is 33. U.S.S.G. §§ 2A1.1, 2A1.2. Because premeditation or lack of it was taken into consideration by the Sentencing Commission in formulating the guidelines for first and second degree murder, it is not a valid ground for departure. We will deny the Government's motion for an upward departure based upon premeditation.

■ The Government also seeks an upward departure pursuant to United States Sentencing Guidelines § 5K2.6 because a weapon was used in the offense. That section provides:

> If a weapon or dangerous instrumentality was used or possessed in the commission of the offense the court may increase the sentence above the authorized guideline range. The extent of the increase ordinarily should depend on the dangerousness of the weapon, the manner in which it was used, and the extent to which its use endangered others. The discharge of a firearm might warrant a substantial sentence increase.

The relevant guideline for second degree murder, § 2A1.2, is silent with respect to consideration of whether a weapon is used. The policy statement in Section 5K2.0 of the United States Sentencing Guidelines provides guidance in situations where a factor is not listed as a specific offense characteristic. That section states:

> Also, a factor may be listed as a specific offense characteristic under one guideline but not under all guidelines. Simply because it was not listed does not mean that there may not be circumstances when that factor would be relevant to sentencing. For example, the use of a weapon has been listed as a specific offense characteristic under many guidelines, but not under other guidelines. Therefore, if a weapon is a relevant factor to sentencing under one of

these other guidelines, the court may depart for this reason.

The Court of Appeals for the Ninth Circuit in *United States v. Carpenter*, 914 F.2d 1131 (9th Cir.1990) upheld an upward departure under § 5K2.6 where the defendants were convicted of a murder-for-hire scheme in which they provided firearms to juveniles. The court determined that the language of Section 5K2.6 demonstrates that the Sentencing Commission was aware that possession of a weapon was a circumstance that was not always reflected in the different offense levels under the Guidelines. *Id.* at 1134. The court concluded that if weapon possession were adequately reflected in the individual offense levels there would be no reason for a separate departure provision.

Here, Paster used a butcher knife in the murder. Section 5K2.6 explicitly authorizes an upward departure where a weapon is used in the commission of an offense. We have authority to depart upwards for use of a weapon. However, we took Paster's use of a knife to stab his victim sixteen times into account as the predominant factor when we decided to depart upward for extreme conduct and we decline to depart upwards again for the use of the weapon. We will deny the Government's request for an upward departure for use of a weapon.

■ Paster seeks a downward departure from the imprisonment range for aberrant behavior. Aberrant behavior justifying a downward departure "must involve a lack of planning; it must be a single act that is spontaneous and thoughtless, and no consideration is given to whether the defendant is a first-time offender." *United States v. Marcello*, 13 F.3d 752, 761 (3d Cir.1994). Here, there are indications that the murder was spontaneous. Dr. Robert L. Sadoff, a psychiatrist retained by Paster, stated that an "outward explosion of violence is atypical and foreign for Mr. Paster."

There is insufficient evidence to show that Paster had planned the killing of his wife. The Government contends that the fact that Paster parked his car in the garage at the marital home the night prior to the murder proves planning. We find the argument unpersuasive. Even if Paster took the knife from the kitchen and went upstairs to murder his wife that does not sufficiently demonstrate planning.

However, the murder was not committed in a thoughtless manner. Thoughtlessness is an essential element under *Marcello,* Thoughtfulness is missing in this case. Paster had ample time in the minutes preceding the stabbing to think about whether to murder his wife. Further, the number of times Paster stabbed his wife indicates that he thought about the act as it was being done. There is no authority to depart on the basis of aberrant behavior under *Marcello.* We will deny Paster's request for a departure on the basis of aberrant behavior.

■ Paster also seeks a downward departure pursuant to United States Sentencing Guideline § 5K2.10 for victim's conduct. That provision sets forth several factors which the Court should consider in deciding whether to depart for victim's conduct: 1) the size and strength of the victim in comparison to the defendant; 2) the persistence of the victim's conduct and any efforts by the defendant to prevent confrontation; 3) the danger reasonably perceived by the defendant, including the victim's reputation for violence; 4) the danger actually presented to the defendant by the victim; and 5) any other relevant conduct by the victim that substantially contributed to the present danger. Paster claims that his wife threatened retaliation by her friends for a prior complaint by Paster to the Assistant Warden of the Lewisburg Penitentiary relating to his wife's affair. In addition, Paster claims that his wife told him on the day of her murder that she had had numerous affairs in the past. There is no confirmation of Paster's statements as to any prior affairs. Those allegations even if true do not indicate that the victim substantially provoked her murder. Even though we have the authority to depart for victim misconduct the conduct of the victim in this case does not warrant a departure. We will deny Paster's request for a downward departure for victim conduct.

## B. Adjustment Issues

■ Paster objects to the two level upward adjustment applied by the Probation

Officer for obstruction of justice. United States Sentencing Guidelines § 3C1.1 provides:

> If the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the investigation, prosecution, or sentencing of the instant offense, increase the offense level by 2 levels.

The guidelines state that an example of obstruction of justice is providing materially false information to a judge. U.S.S.G. § 3C1.1, comment (n.3f). The guidelines define material information as information which if believed would tend to influence or affect the issue under determination. U.S.S.G. § 3C1.1, comment (n.5). The guidelines also state that "the court should be cognizant that inaccurate testimony or statements sometimes may result from confusion, mistake, or faulty memory and, thus, not all inaccurate testimony or statements necessarily reflect a willful attempt to obstruct justice." U.S.S.G. § 3C1.1, comment (n.1); *see also, U.S. v. Dunnigan,* 507 U.S. 87, 94, 113 S.Ct. 1111, 122 L.Ed.2d 445 (1993) (holding that an adjustment for obstruction of justice for perjury may be warranted if a witness commits perjury by giving false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory).

The probation officer determined that an upward adjustment for obstruction of justice was warranted because Paster filed a motion to suppress the statements which he made to investigators during the interview conducted on August 16, 1996. On November 22, 1996 a hearing was held on that motion during which Paster testified that any statements he gave during the interview were the product of promises by agents that they would allow him to call his mother only if he answered their questions. On December 6, 1996, we issued an order in which we determined that that testimony was not credible. The presentence report states that Paster's testimony, if believed, would likely have influenced the issue under consideration and thus Paster obstructed justice by giving false testimony concerning a material matter.

The order of December 6, 1996, which held that Paster's testimony at the suppression hearing was not credible with respect to his claims that he did not understand the effect of signing the Waiver of Rights form and that his statements were the products of promises by the agents that he would be able to call his mother only if he answered the agents' questions did not state that Paster's testimony was made with a willful intent to provide false testimony. Paster's statements at the suppression hearing were in our view made likely as a result of confusion and misrecollection resulting from the enormity of the murder itself. Paster was extremely distraught during the 911 telephone call in which he stated that he had stabbed his wife. He was nervous when he was seated in a chair in the dining room following the arrival of the agents. While detained by the agents Paster was at times extremely upset, crying, shaking and despondent. Given Paster's state of mind following the murder it is likely that he was confused about the events which took place during the interview. That confusion was reflected in his testimony at the suppression hearing which although not credible was not made with a willful intent to provide false testimony. The upward adjustment pursuant to United Stated Sentencing Guidelines § 3C1.1 for obstruction of justice applied by the Probation Officer is not warranted.

■ Paster also argues that he is eligible for reductions in the offense level for acceptance of responsibility. The Probation Officer did not recommended a reduction in the offense level for acceptance of responsibility because he adjusted upward the offense level for obstruction of justice. The Guidelines state that if a Defendant obstructs the administration of justice it usually indicates that he has not accepted responsibility. U.S.S.G. § 3E1.1. A two level reduction is warranted if the Defendant clearly demonstrates acceptance of responsibility. U.S.S.G. § 3E1.1(a). Consideration may be given to the Defendant's admission of the conduct comprising the offense of conviction and voluntary surrender to the authorities. U.S.S.G. § 3E1.1 comment (n. 1(a)(d)(e)). Here, Paster admitted both during the 911

telephone call and to the agents that he had committed the murder. Paster also stated during the presentence hearing that he had murdered his wife. Paster did not leave the scene of the crime prior to the arrival of the police and he voluntary surrendered when they arrived. He told an operator at the Union Emergency Services where the knife was located. Paster subsequently pled guilty to second-degree murder. Paster has accepted responsibility for the murder of his wife and is entitled to a two level decrease in the offense level pursuant to § 3E1.1(a).

■ Paster argues that he is entitled to a decrease of an additional level for acceptance of responsibility pursuant to United States Sentencing Guidelines § 3E1.1(b). Under that section the offense level should be decreased by one additional level if a Defendant qualifies for the two level decrease for acceptance of responsibility, the offense level determined prior to the two level decrease is 16 or greater and the defendant has either timely provided complete information to the government concerning his own involvement in the offense or has timely notified authorities of his intention to enter a plea of guilty and thereby permitted the government to avoid preparing for trial and the court to allocate its resources efficiently.

Paster did not timely notify the authorities of his intention to plead guilty which would have permitted the Government to avoid preparing for trial. Paster offered to plead guilty to voluntary manslaughter approximately a week prior to jury selection. His offer was rejected by the Government two days thereafter and the Government offered a plea of second-degree murder on the same date. The jury was selected and nine days thereafter Paster accepted the counter-offer. The Government had prepared for trial. Paster is not entitled to an additional one level decrease in the offense level for acceptance of responsibility because he did not timely notify the authorities of his intention to enter a plea of guilty.

### C. Factual Disputes

Paster objects to paragraphs 5 and 7 in the presentence report which relate to the 911 telephone call by Paster to the Union County Emergency Services. Paster argues that contrary to paragraph 5 he did not say to the operator "Hi, I just stabbed my wife," but rather stated "I,I,I just stabbed my wife." In addition, Paster argues that paragraph 7 which relates a conversation between Dr. Corey and Paster when Dr. Corey entered Paster's house after the murder is incorrect. Paster requests that we review the audiotape to ascertain the accurate statements of Paster and Dr. Corey. The sections of the phone call as related in paragraph five of the presentence report to which Paster objects are not decipherable on the audiotape. Whether Paster stated "Hi" or "I,I,I," and the exact wording of the conversation between Dr. Corey and Paster are not relevant and will not be taken into account in the decision regarding Paster's sentence. *See* Fed.R.Crim.P. 32(c)(1).

Paster further objects to the last two sentences of paragraph 12. That paragraph, *inter alia*, states:

> Paster related that he first suspected them when Margaret and Corey left their house one night in July, 1996, and Margaret did not return home until the next morning. Angered by this, Paster left their residence and went to his parents' home in New Jersey. Later in July Paster returned to Lewisburg. NOTE: Defense Counsel advises that the defendant returned as a result of his wife's request.

Paster contends that he left the residence the same day that his wife failed to return home at night after leaving with Dr. Corey. Also, Paster objects that paragraph 12 does not unequivocally state that he returned to the marital residence as a result of his wife's request. Whether Paster left the marital residence the same day that his wife failed to return home after leaving with Dr. Corey and whether Paster returned to the residence as a result of his wife's request are not relevant and will not be taken into account in deciding Paster's sentence.

Paster also objects to paragraphs 17 and 25 of the presentence report which state that he informed the investigators that he took the knife from the kitchen and carried it upstairs. Paster argues that he informed them that the knife must have come from the

**354**

butcher block in the kitchen because that is where it was usually located but that he did not know for certain. As determined in Findings of Fact 16 and 17 Paster's testimony on this point is not credible. Paster's objections to paragraphs 17 and 25 of the presentence report will be overruled.

## IV. RECAPITULATION

| | |
|---|---|
| Total Offense level as determined by the Probation Officer | 35 |
| Upward Departure for extreme conduct | 9 |
| Downward Adjustment for acceptance of responsibility | (2) |
| Downward Adjustment for obstruction of justice | (2) |
| Total offense level | 40 |

## V. CONCLUSIONS OF LAW

1. Paster's actions were unusually heinous, cruel and brutal and warrant an upward departure of nine levels from the sentencing guideline range because of extreme conduct.

2. An upward departure for premeditation is not warranted.

3. An upward departure for use of a weapon is not warranted.

4. A downward departure for aberrant behavior is not warranted.

5. A downward departure for victim's conduct is not warranted.

6. An upward adjustment for obstruction of justice is not warranted.

7. A two level downward adjustment for acceptance of responsibility is warranted.

8. An additional one level downward adjustment for acceptance of responsibility is not warranted.

9. The portions of paragraphs 5, 7 and 12 of the presentence report to which Paster objects and which relate to the 911 telephone call and the conversation between Paster and Dr. Corey are not relevant and will not be taken into account in the decision regarding Paster's sentence.

10. The offense level is 40 and the Criminal History Category is I.

11. The guideline imprisonment range is 292 months to 365 months, or 24 years and 4 months to 30 years and 5 months.