**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Geraldo HERRERA, Defendant–**
**Appellant.**

**No. 95–1580.**

United States Court of Appeals,
Seventh Circuit.

Argued Oct. 5, 1995.

Decided Oct. 30, 1995.

Barry Rand Elden, Chief of Appeals and Cheryl Bell (argued), Office of the United States Attorney, Criminal Appellate Division, Chicago, IL, for Plaintiff–Appellee.

Kenyatta L. Tatum (argued), Office of the Federal Defender Program, Chicago, IL, for Defendant–Appellant.

Before EASTERBROOK, MANION, and KANNE, Circuit Judges.

EASTERBROOK, Circuit Judge.

Cynthia LaBoy Herrera survived a nightmare. She and her husband Geraldo Herrera were arrested after a drug transaction. The couple, separated by the agents, then played and lost a game of Prisoner's Dilemma. See *Page v. United States*, 884 F.2d 300 (7th Cir.1989); Douglas G. Baird, Robert H. Gertner & Randal C. Picker, *Game Theory and the Law* 312–13 (1994). Cynthia told agents who their suppliers were. Learning of this, Geraldo talked too. When both were out on bond, Geraldo decided that Cynthia should pay for initiating the revelations. Geraldo clobbered Cynthia on the back of her head with a hammer; while she tried to defend herself, Geraldo declared that she talked too much to the DEA. As Cynthia grappled with the hand holding the hammer, Geraldo used his free hand to punch her in the face. Geraldo got the other hand free and hit Cynthia repeatedly with the hammer; she lapsed into unconsciousness. She awoke near the front door in a pool of her own blood and crawled into the kitchen in search of water, but she could not rise to open the tap. Geraldo found her there and slashed both sides of her throat with a scalpel, then carved the skin from around her ears. Next Geraldo jumped onto her back, forcing blood from the open wounds, and again Cynthia lost consciousness. Geraldo cut himself in preparation for a tale that an unknown intruder had attacked both of them. Cynthia's survival until her brother arrived the next morning is miraculous. She had emergency surgery as soon as the police got her to a hospital, and she has endured several other surgical procedures since. In addition to the scars, Cynthia suffers brain damage and nerve damage in her right arm. She received months of physical therapy, plus psychiatric treatment that lasted through the trial and may be ongoing. Geraldo, who told the DEA that he slit Cynthia's throat because she cooperated and "had a big mouth," is in prison for retaliation against a witness, in violation of 18 U.S.C. § 1513, as well as for his drug crimes. The total sentence of 180 months strikes us as lenient for such heinous acts. But Geraldo believes that it is too high, and sentencing is the only issue on appeal.

The district court concluded that Geraldo's drug crimes came to 30 offense levels, including 2 levels for a managerial role and 2 more for obstruction of justice. The base for the retaliation offense under USSG § 2J1.2 is 12 levels, increased by 8 because "the offense involved causing or threatening to cause physical injury to a person", § 2J1.2(b)(1). Next came the grouping procedure. The drug and retaliation offenses were placed in a

single group under § 3D1.2(c). See also § 3C1.1 Application Note 6. Because of the 10–level disparity in the offense levels, the retaliation offense did not contribute toward the final offense level. See also § 3D1.4(c). So Geraldo emerged from the grouping procedure with an offense level of 30; the mayhem perpetrated on his wife did not affect the calculated seriousness of the crimes. The district court thought this an appropriate occasion to depart, if only because the vicious assault was substantially more serious than the generic "causing or threatening to cause physical injury to a person" to which § 2J1.2(b)(1) refers. The district court departed upward by five levels, and the final offense level of 35 led to the 180–month sentence. Geraldo says that this went wrong in at least two ways: (1) the grouping procedure meant that the attempted murder does not count, and a departure may not be based on disagreement with the Guidelines; (2) the judge did not explain why he chose 5 levels rather than some other number, and did not link the amount of departure to the structure of the Guidelines. See, e.g., *United States v. Thomas*, 930 F.2d 526, 530 (7th Cir.1991); *United States v. Schmude*, 901 F.2d 555, 560 (7th Cir.1990).

■ Often the best way to test whether a particular degree of departure is appropriate is to use other provisions of the Guidelines as benchmarks. See *United States v. Ferra*, 900 F.2d 1057, 1061–63 (7th Cir.1990). But which other provisions? The key to this puzzle lies in the relevant-conduct guidelines. Judges are accustomed to their quantity-aggregation feature, § 1B1.3(a)(2), which calls for adding up all drugs sold (sums stolen, etc.) as part of a single scheme or course of conduct. The next and oft-overlooked subsection of the relevant-conduct guideline requires the court to consider "all harm that resulted from the acts or omissions specified in subsections (a)(1) and (a)(2) above, and all harm that was the object of such acts and omissions". Subsections (a)(1) and (a)(2) cover everything included in a specific offense characteristic caused by the defendant. One of the specific offense characteristics under § 2J1.2 is actual or threatened physical injury. To include "all harm that resulted" within the domain of this specific offense characteristic means to turn to the guideline that

deals directly with the particular harm covered in the specific offense characteristic—in this case, attempted murder. See also *United States v. Masters*, 978 F.2d 281 (7th Cir. 1992); *United States v. Kikumura*, 918 F.2d 1084, 1115 (3d Cir.1990). In *Masters* and *Kikumura* explicit cross-references authorized this procedure; departures often take the form of implicit cross-references to analogous offenses.

■ Thus we arrive at § 2A2.1, which covers attempted murder. The base offense level is 28, § 2A2.1(a)(1), because success would have been first-degree murder. The victim's "permanent or life-threatening bodily injury" produces another four levels under § 2A2.1(b)(1). This approach affects grouping too: under § 3D1.2(d) "all offenses in Chapter Two, Part A" belong in a separate group—for drug sales and attempted murder do not involve "substantially the same harm" (§ 3D1.2). Cf. *United States v. Bruder*, 945 F.2d 167, 170–71 (7th Cir.1991) (en banc). Now we have two groups, the drug offense at level 30 and the retaliation offense at level 32. Under § 3D1.4(a), each group counts as one unit when the groups are within four offense levels. The total is therefore two units, which the table in § 3D1.4 translates to two offense levels, added to the more serious group. Total: 34 offense levels. Geraldo's criminal history score of I yields a range of 151–188 months, high enough to authorize his sentence of 180 months. Enough has been said, we think, to show that the Guidelines do not require a court to ignore the murderous assault just because it can be grouped with the cocaine offense. Imagine how the calculation would have worked had Geraldo not been charged with any drug crime. Then the assault would come to the fore; the sentence cannot be lower because the defendant's crimes are more numerous.

■ So far this procedure has justified a departure of four levels, from 30 to 34, but the district court treated Geraldo's course of conduct as equivalent to level 35, with a range of 168–210 months. We do not think that the judge's failure to say that he would have imposed the same sentence had he calculated the offense at 34 levels, see *United States v. Mount*, 966 F.2d 262 (7th Cir.1992), calls for a remand. One underpinning of the

district court's departure, not taken into account by the analogy to attempted murder, was Cynthia's "extreme psychological injury", a step § 5K2.3 authorizes. One level of departure on this ground is not problematic, given the uncontested evidence that Cynthia required extended psychiatric care. See *United States v. Otto,* 64 F.3d 367 (8th Cir. 1995) (expert testimony is not needed to support a departure under § 5K2.3). Cynthia's recovery (she is in college, making progress toward a degree in teaching) does not diminish Geraldo's culpability. The district court's invocation of § 5K2.8, which authorizes a departure when "the defendant's conduct was unusually heinous, cruel, brutal, or degrading to the victim" also is impossible to question, given that section's advice that "[e]xamples of extreme conduct include torture of a victim, gratuitous infliction of injury, or prolonging of pain and humiliation"— all of which Geraldo did. The district court readily could have justified a final offense level higher than 35 and a sentence substantially exceeding 180 months' incarceration.

The best way to find the right amount of departure is to work through the treatment of analogous offenses, as we have done. This procedure shows that treating Geraldo's offense as level 35 was conservative, and the sentence is therefore

AFFIRMED.