

1999 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

4-19-1999

# USA v. Paster

Precedential or Non-Precedential:

Docket 98-7270

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1999

Recommended Citation

"USA v. Paster" (1999). *1999 Decisions.* Paper 104.
http://digitalcommons.law.villanova.edu/thirdcircuit_1999/104

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1999 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed April 19, 1999

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 98-7270

UNITED STATES OF AMERICA

v.

MITCHELL FREDERICK PASTER,
        Appellant

On appeal from the United States District Court
for the Middle District of Pennsylvania
(D.C. No. 96-cr-00221)
District Judge: Honorable Malcolm Muir

Argued December 15, 1998

Before: SLOVITER and COWEN, Circuit Judges,
and OBERDORFER, District Judge*

(Filed April 19, 1999)

Shalom D. Stone (Argued)
Walder, Sondak & Brogan
Roseland, NJ 07068
 Attorney for Appellant

Wayne P. Samuelson (Argued)
United States Attorney's Office
Williamsport, PA 17703
 Attorney for Appellee

_____

*Hon. Louis F. Oberdorfer, United States District Court for the District
of Columbia, sitting by designation.

OPINION OF THE COURT

OBERDORFER, District Judge.

We here review sentencing decisions rendered by the District Court below in a very troubling case of murder on a federal reservation. On August 28, 1996, a federal grand jury returned an indictment charging Mitchell Frederick Paster with premeditated murder of his wife, Dr. Margaret Bostrom, by stabbing her repeatedly with a butcher knife. 18 U.S.C. SS 7(3), 1111. At arraignment, Paster pled not guilty, and later noticed his intention to plead insanity. Thereafter, the government indicated that it would not seek the death penalty authorized by 18 U.S.C. S 1111(b). On the eve of trial, the government and Paster agreed that he would plead guilty to second degree murder. At the hearing preliminary to his acceptance of the plea, the District Judge elicited from the probation officer and the prosecutor their best estimate that, as of that time, Paster would face imprisonment ranging from 168 to 210 months. After a two-day presentence hearing, the District Court ordered Paster confined for 365 months.

On this appeal, Paster challenges four aspects of the sentencing decision: 1) denial of a downward departure on account of Dr. Bostrom's allegedly provocative conduct; 2) denial of a downward departure on account of Paster's arguably aberrant behavior; 3) denial of an additional one-level downward adjustment for Paster's alleged acceptance of responsibility; and 4) imposition of a nine-level upward departure for "extreme conduct." For the reasons stated herein, we affirm the District Court with respect to issues

one and two, reverse with respect to issue three, and remand for resentencing after the District Judge has an opportunity to reconsider his resolution of issue four in light of our opinion. See Koon v. United States, 518 U.S. 81, 98 (1996).

I.

The presentence investigation report ("PSR") and Paster's testimony at the presentence hearing disclosed, and the District Court found, that Paster and Margaret met in 1985 and married in 1994. At the time of the murder they lived in Lewisburg, Pennsylvania, where she worked as a psychologist at the United States Penitentiary. In the months immediately preceding the August 1996 stabbing, the couple experienced serious marital problems. One night in July 1996, after Margaret went out with her supervisor and did not come home, Paster left Lewisburg for his parents' home in New Jersey. While there, Paster was served on July 25 with divorce papers filed by his wife on July 18.[1] Thereafter the two reportedly reconciled by telephone. However, on August 12, 1996, after Margaret revealed that she was having an affair with her supervisor, Paster returned to his parents' home.

After further efforts to reconcile, on the night of August 15 Paster returned home, only to find that his wife was not there. According to him, she drove by their home on two separate occasions that night. When she returned the following morning, he confronted her about where she had been. She apparently became upset, and telephoned the warden at the Lewisburg Penitentiary, to whom Paster had revealed the ongoing affair. Margaret handed Paster the telephone receiver, and instructed him to retract his prior statement to the warden. Paster told the warden that he would not retract the statement, despite being pressured. After hanging up the phone, Margaret mentioned that she had a friend on the reservation who kept weapons at his house, and that if Paster did not retract his statement she would entice the friend "to do whatever she wanted." She then told Paster that she had had between forty and fifty affairs during their relationship, and planned to continue to pursue the relationship with her supervisor. Thereupon she went upstairs to take a shower, leaving Paster downstairs.

_____

1. Paster's response to the filing was due August 15, 1996. He claims that his wife told him that she planned to withdraw her request for a divorce, but her lawyer reported having no knowledge of such plans.

3

At one point, Paster went outside and conversed with a neighbor, who reported later that Paster was "very calm, pleasant, and very soft-spoken." PSR at 9. Minutes later, however, he went back inside, retrieved a knife from the butcher block in the kitchen, proceeded upstairs, and then, as Margaret emerged from the shower, stabbed her with the knife numerous times. According to an autopsy report prepared by Dr. Samuel Land, a forensic pathologist, she died of multiple stab wounds to various vital organs. Specifically, Dr. Land counted sixteen stab wounds -- nine of which were life-threatening and six of which were to the heart -- and eleven slash wounds indicative of defensive action. Dr. Land also reported that one stab wound completely penetrated Margaret's sternum, and that one wound penetrated her body and the floor tile beneath her. At the sentencing hearing, Dr. Land testified that Margaret's death "was a very violent" one, and that it "was one of the most severe cases I've seen." Appendix ("App.") at 189.

After the murder, Paster telephoned his mother at her place of employment. He then called 911 and reported that he had stabbed his wife in the chest. He told the emergency operator his name, his telephone number, and his address, and described the location of the bloody knife. He remained on the phone until authorities arrived. First on the scene were personnel from the Bureau of Prisons. He told them that he had stabbed his wife and that she was in the upstairs bathroom. The BOP personnel found her body in the bathroom; she was lying naked on the floor in a pool of blood -- dead.

Later that afternoon, agents of the Federal Bureau of Investigation arrested Paster and took him to the Lewisburg Penitentiary Training Center for questioning. Atfirst, he said that he could not remember what happened upstairs; later in the interview, however, he responded that he did not want to talk about the events that had transpired. According to a February 25, 1998 presentence investigation report, he "remain[ed] unable to recall the actual murder, but acknowledged his involvement in the offense." PSR at 10. Meanwhile, he filed, and the District Court denied, a motion to suppress statements that he made to

4

investigators on the theory that the FBI agents induced his statements by promising that he would be able to call his mother.

In response to Paster's notice of an insanity plea, Dr. Robert Sadoff, a psychiatrist, concluded after two examinations that Paster "did not deliberate or premeditate this killing," and that "[t]he outward explosion of violence was atypical and foreign" for him. App. at 44. Dr. Sally Johnson, Chief Psychiatrist for the Mental Health Division at FCI Butner, concluded that "[t]here was no indication that [Paster] had formulated any plan to harm his wife," and that his reported symptoms of memory loss were consistent with dissociative amnesia. Id. at 60-61. Dr. Sadoff further concluded that, in his opinion, there was no insanity defense. Thereafter, on the eve of trial and pursuant to the plea agreement, Paster pled guilty to second degree murder, and the case entered its sentencing phase.

In calculating Paster's sentence, the District Judge began from the base offense level of 33 for second degree murder. United States Sentencing Guidelines ("U.S.S.G.") S 2A1.2. He then granted a two-level reduction for acceptance of responsibility; denied enhancements for premeditation and use of a weapon; imposed a nine-level upward departure for extreme conduct; denied a downward departure for aberrant behavior; denied a downward departure for victim's conduct; and denied an additional one-level reduction for acceptance of responsibility. The District Court calculated an offense level of 40. Having no prior criminal record, Paster was in criminal history category I, and therefore subject to a guideline incarceration range of 292-365 months. The District Court imposed the maximum for the offense level: 365 months, or thirty years and five months. Paster appeals.

II.

Paster first argues that the District Court erred by denying his motion for a downward departure pursuant to S 5K2.10 of the guidelines. That section permits a downward departure "[i]f the victim's wrongful conduct

contributed significantly to provoking the offense behavior." U.S.S.G. S 5K2.10. Paster argued to the District Court that his wife's revelation of past infidelity exposed wrongful conduct and was the sole provocation for the fatal stabbing. The District Court rejected Paster's argument, reasoning that "[t]here is no confirmation of Paster's [sic] statements as to any prior affairs," and that "[t]hose allegations even if true do not indicate that the victim substantially provoked her murder." United States v. Paster, 17 F. Supp.2d 345, 351 (M.D. Pa. 1998). Thus, the District Court wrote: "Even though we have the authority to depart for victim misconduct the conduct of the victim in this case does not warrant a departure." Id. We review for clear error. United States v. McQuilkin, 97 F.3d 723, 730 (3d Cir. 1996).

By its terms, S 5K2.10 hinges a departure on two criteria: 1) the victim must have committed "wrongful conduct;" 2) and such conduct must have "contributed significantly to provoking the offense behavior." The policy statement instructs that

> [i]n deciding the extent of a sentence reduction, the court should consider: a) the size and strength of the victim, or other relevant physical characteristics, in comparison with those of the defendant; b) the persistence of the victim's conduct and any efforts by the defendant to prevent confrontation; c) the danger reasonably perceived by the defendant, including the victim's reputation for violence; d) the danger actually presented to the defendant by the victim; and e) any other relevant conduct by the victim that substantially contributed to the danger presented.

U.S.S.G. S 5K2.10. By delineating these five factors, the guidelines contemplates departures where the victim's conduct posed actual, or reasonably perceived, danger to the defendant, with emphasis on physical danger. Court decisions confirm what the context of guideline S 5K2.10 implies: Generally only violent conduct, albeit wrongful, justifies a downward departure. See Blankenship v. United States, 159 F.3d 336, 339 (8th Cir. 1998), cert. denied, 1999 WL 8730 (Jan. 11, 1999) (affirming denial of departure because while conduct was "wrongful," it was not violent); see also United States v. Bigelow, 914 F.2d 966,

6

975 (7th Cir. 1990) (physical blocking of doorway was not "sufficient physical contact to provoke the attack") (emphasis added). Cf. United States v. Shortt, 919 F.2d 1325, 1328 (8th Cir. 1990) (embracing idea that "there's hardly any greater provocation than to have someone having an affair with your spouse").

The District Court denied a S 5K2.10 departure because there was no danger or reasonable perception of danger to Paster. Paster, 17 F. Supp.2d at 351. There is ample record evidence to support the denial. First, Margaret's size and strength posed no threat to Paster. Second, Paster himself initiated the fatal confrontation. Third, the record contains no suggestion that Margaret had a reputation for violence; it was the District Court's prerogative to discount danger to Paster from his wife's friend. In any event, all of the circumstances -- Paster armed with a knife, attacking his wife as she emerged from a shower -- demolish his victim provocation claim.2

The foregoing considered, it was not necessary to decide whether revelation of past infidelities, or the infidelities themselves, could ever constitute such "wrongful conduct" as to mitigate a sentence for murder. However, even if Margaret's conduct, as revealed moments before the attack, were wrongful within the meaning of S 5K2.10, Paster's response was grossly disproportionate to any provocation.3 Shortt, 919 F.2d at 1328 ("A concern for the proportionality of the defendant's response is manifested by the terms of S 5K2.10."). See also Blankenship, 159 F.3d at 339; United States v. Morin, 80 F.3d 124, 128 (4th Cir. 1996) (concern

_____

2. This analysis easily distinguishes this case from United States v. Yellow Earrings, 891 F.2d 650 (8th Cir. 1989), where the court of appeals upheld a downward departure upon consideration of uncontroverted evidence that the female defendant had refused the victim's request to engage in sexual intercourse; that the victim was considerably larger than the defendant; that the victim was intoxicated and had a history of unpredictable conduct while intoxicated; and that the defendant reasonably perceived a threat of danger. Id. at 651-54.

3. The District Court found that on earlier occasions Paster had learned of his wife's infidelity, but that instead of reacting as if he were physically endangered, he simply "left the marital residence to live with parents." Paster, 17 F. Supp.2d at 349.

for proportionality "is evidenced by the factors that S 5K2.10 instructs the court to consider"). Cf. United States v. Dailey, 24 F.3d 1323, 1328 (11th Cir. 1994) (affirming departure for defendant who did not physically harm the victim); United States v. Tsosie, 14 F.3d 1438, 1442 (10th Cir. 1994) (affirming departure for defendant who was engaged in physical altercation with the victim). Accordingly, we affirm denial of a downward departure pursuant to S 5K2.10.

III.

Paster next challenges the District Court's refusal to grant a downward departure for "aberrant behavior." See U.S.S.G. Ch. 1, Pt. A, intro. comment P 4(d). This court addressed that ground for departure in United States v. Marcello, 13 F.3d 752 (3d Cir. 1994), decided before the Supreme Court's landmark decision in Koon v. United States, 518 U.S. 81 (1996). Embracing the formula that originated from the Fourth, Fifth, and Seventh Circuits, the Marcello court wrote that "[a]berrant behavior must involve a lack of planning; it must be a single act that is spontaneous and thoughtless, and no consideration is given to whether the defendant is a first-time offender." Id. at 761 (emphasis added). Marcello's construction followed the Seventh Circuit's opinion in United States v. Carey, 895 F.2d 318, 325 (7th Cir. 1990):

> A single act of aberrant behavior . . . generally contemplates a spontaneous and seemingly thoughtless act rather than one which was the result of substantial planning because an act which occurs suddenly and is not the result of a continued reflective process is one for which the defendant may be arguably less accountable.

Carey, 895 F.2d at 325 (emphasis added).

Invoking Marcello, the District Court found "indications that the murder was spontaneous" and that there was "insufficient evidence to show that Paster had planned the killing of his wife." Paster, 17 F. Supp.2d at 351. However, the District Court held that "the murder was not committed in a thoughtless manner," because, the court found, "Paster

8

had ample time in the minutes preceding the stabbing to think about whether to murder his wife," and "the number of times Paster stabbed his wife indicates that he thought about the act as it was being done." Id. The District Court concluded that "[t]here is no authority to depart on the basis of aberrant behavior under Marcello." Id.

Paster challenges the District Court's construction of the term "thoughtless" as used by the Marcello court. According to Paster, the District Court interpreted the term to mean "without conscious thought" or "without intent," as distinguished from "without prior thought," "not well thought-out," or "without premeditation." Appellant's Brief at 34-35. He argues that this construction of "thoughtless" would render meaningless the concept of "aberrant behavior" because most crimes entail a mens rea that would preclude a finding of "thoughtlessness." Because Paster argues that the District Court misinterpreted the legal standard enunciated in Marcello, we exercise plenary review. United States v. Sokolow, 91 F.3d 396, 411 (3d Cir. 1996). See also United States v. Marin-Castaneda, 134 F.3d 551, 554 (3d Cir. 1998), cert. denied, ___ U.S. ___, 118 S. Ct. 1855, 140 L. Ed. 2d. 1103 (1998); United States v. Grandmaison, 77 F.3d 555, 561 (1st Cir. 1996) (undertaking plenary review because district court "adopted the wrong standard").

We decline to upset the District Court's decision rejecting departure. The District Court applied the correct legal standard by properly focusing on the term "thoughtless," because Marcello made thoughtlessness a necessary ingredient of aberrant behavior. 13 F.3d at 761. 4

_____

4. The government argues that because Paster pled guilty to a crime defined as one committed "willfully, deliberately, maliciously" and with "malice aforethought," he necessarily is not eligible for a departure based on "thoughtless" activity. The government argues alternatively that Paster does not qualify for a departure because infliction of sixteen stab wounds and eleven slash wounds does not constitute "a single act" within the meaning of Marcello. We need not reach the former argument because we are satisfied that the District Court applied the proper standard pursuant to Marcello, and we need not reach the latter argument because the District Court's finding that Paster's conduct was not "thoughtless" makes the single act issue redundant.

Specifically, the District Court found that Paster "had ample time in the minutes preceding the stabbing to think about whether to murder his wife," and that "the number of times Paster stabbed his wife indicates that he thought about the act as it was being done." Paster, 17 F. Supp.2d at 351 (emphasis added). These penultimate findings amply support the ultimate finding that the murder was not "thoughtless." Nor does the failure of the District Court to make an additional ultimate finding about a "continued reflective process" constitute reversible error in the context of this case. Marcello, 13 F.3d at 761 (quoting Carey, 895 F.2d at 325). The District Court's finding about the "ample time in the minutes preceding the stabbing" and the multiple stabbings convey the Marcello concept of a continuum, as distinguished from a mere "opportunity to consider [the] crime." Diss. Opp. at 28 (emphasis in original). Also, the term "reflective" used in Marcello clearly imports the concept of "thoughtful," the antonym of "thoughtless." See Webster's Third New International Dictionary 2381 (1971).5

In view of the foregoing, the District Court's finding that Paster's conduct was not "thoughtless" was not clearly erroneous, and its application of the Marcello  standard supported the conclusion that on these facts Paster was not entitled to an aberrant conduct departure. Cf. Marcello, 13 F.3d at 761 (district court's decision "not to depart, after applying the correct legal standard, is discretionary and unreviewable"). Cases from other circuits that affirmed denial of an aberrant behavior departure, and that pre-date the Supreme Court's opinion in Koon, 518 U.S. 81, see, e.g., United States v. Garlich, 951 F.2d 161 (8th Cir. 1991), United States v. Glick, 946 F.2d 335 (4th Cir. 1991), do not hold otherwise. Thus, the District Court's statement that it had "no authority to depart on the basis of aberrant

_____

5. The Marcello barrier to consideration in an aberrant behavior context of whether subsequent violence is "out of character" or a "first offense," Marcello, 13 F.3d at 761 (quoting Carey, 895 F.2d at 325), precludes consideration here of the apparent fact that Paster had no history of domestic, or any other kind, of violence, and that indeed he had reacted passively when his wife and her paramour separatelyflaunted their affair before him. Cf. Diss. Op. at 30.

10

behavior under Marcello," Paster, 17 F. Supp.2d at 351,
may fairly be construed as nothing more than a conclusion
that the facts of this case applied to the principles
announced in Marcello do not qualify Paster for an aberrant
behavior departure. Accordingly, we affirm denial of a
departure for aberrant behavior.

We would reach the same result were we to test our
analysis by direct reference to Koon. Koon established that
a sentencing court considering a departure mustfirst ask,
"What features of this case, potentially, take it outside the
Guidelines' `heartland' and make of it a special, or unusual,
case?" 518 U.S. at 95 (citation omitted). Once a court
identifies a "special" feature, it is directed to assess whether
the Guidelines forbid, encourage, discourage, or fail to
mention a departure based on that feature. Id. at 95-96.
The answer to this second inquiry shapes the remaining
analysis:

>  If the special factor is a forbidden factor, the
>  sentencing court cannot use it as a basis for departure.
>  If the special factor is an encouraged factor, the court
>  is authorized to depart if the applicable Guideline does
>  not already take it into account. If the special factor is
>  a discouraged factor, or an encouraged factor already
>  taken into account by the applicable Guideline, the
>  court should depart only if the factor is present to an
>  exceptional degree or in some other way makes the
>  case different from the ordinary case where the factor
>  is present. If a factor is unmentioned in the Guidelines,
>  the court must, after considering the structure and
>  theory of both relevant individual guidelines and the
>  Guidelines taken as a whole, decide whether it is
>  sufficient to take the case out of the Guideline's
>  heartland. The court must bear in mind the
>  Commission's expectation that departures based on
>  grounds not mentioned in the Guidelines will be highly
>  infrequent.

Id. (citations and internal quotation marks omitted)
(emphasis added).

Aberrant behavior is an "unmentioned factor." See United
States v. Kalb, 105 F.3d 426, 429 (8th Cir. 1997). So here,

11

the District Court relied entirely upon the Marcello definition of the term. Having determined that Paster's behavior was not aberrant within the meaning of Marcello, the District Court had no occasion to attempt to extrapolate from "the structure and theory of both relevant individual guidelines and the Guidelines taken as a whole" whether Paster's behavior was "sufficient to take the case out of the [second degree murder guideline's (S 2A1.2)] heartland." Koon, 518 U.S. at 96. The District Court's analysis therefore was consistent with both Marcello and with the Koon Court's caution that departures relying on unmentioned factors should be "highly infrequent." Id. Accordingly, we affirm denial of a departure for aberrant behavior.

IV.

Paster next argues that, even though the District Court granted him a two-level adjustment for acceptance of responsibility, it erred by denying his motion for an additional one-level adjustment pursuant to S 3E1.1 of the guidelines. That section provides that a defendant is entitled to an additional one-level decrease if he qualifies for a two-level decrease for acceptance of responsibility, his offense level is sixteen or greater, and he

> has assisted authorities in the investigation or prosecution of his own misconduct by taking one or more of the following steps: (1) timely providing complete information to the government concerning his own involvement in the offense; or (2) timely notifying authorities of his intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial and permitting the court to allocate its resources efficiently.

U.S.S.G. S 3E1.1(b) (emphasis added). There is no dispute that Paster met the first two criteria of S 3E1.1: The District Court awarded him a two-level reduction for acceptance of responsibility and his offense level was greater than sixteen. The District Court concluded, however, that Paster did not qualify for the additional one-level reduction because his decision to plead guilty after the jury was

12

selected did not constitute timely notification within the meaning of S 3E1.1(b)(2). Paster, 17 F. Supp.2d at 353.

Paster appeals this determination. First, he argues that although the District Court considered whether he timely notified the government of his intent to plead guilty, it failed to consider whether he timely provided complete information concerning his involvement in the crime. Paster argues further that his statements to the Bureau of Prisons personnel who responded to his call to 911 support a finding that he timely provided complete information concerning his involvement in the crime -- and therefore should have received the additional one-level reduction. Because Paster contends that the District Court committed legal error, we review de novo. United States v. Maurello, 76 F.3d 1304, 1308 (3d Cir. 1996).

We are persuaded that Paster has the better of this argument. The third prong of S 3E1.1(b) is in the disjunctive. United States v. Lancaster, 112 F.3d 156, 158 (4th Cir. 1997); United States v. Williams, 86 F.3d 1203, 1206 (D.C. Cir. 1996); United States v. Eyler, 67 F.3d 1386, 1391 (9th Cir. 1995). By its plain terms, it is satisfied if the defendant "has assisted authorities in the investigation or prosecution of his own misconduct by taking one or more of the following steps: (1) timely providing complete information to the government concerning his own involvement in the offense; or (2) timely notifying authorities of his intention to enter a plea of guilty . . . ." U.S.S.G. S 3E1.1(b) (emphasis added). The District Court considered only whether Paster satisfied the latter criterion, not whether he satisfied the former. Paster, 17 F. Supp.2d at 353. Accordingly, the District Court erred as a matter of law by failing to apply S 3E1.1(b)'s disjunctive standard. Maurello, 76 F.3d at 1308.

The government argues that even if the District Court erred, Paster still is not entitled to the additional one-level reduction because "throughout the investigation .. . and continuing through his interview with the Probation Officer . . ., [he] continually attempted to minimize his role in the offense." Appellee's Brief at 27-28 (emphasis in original). For example, the government alludes to evidence that Paster initially told investigators that he did "not

13

remember" much of what happened -- belied, the government says, by his admissions to the emergency operator -- and that he "did not want to talk about it." Id. at 28. The government also cites psychiatric reports and the presentence investigation report, which purportedly document that Paster attempted to ascribe blame for the killing to his wife's revelation of infidelity.

The government's argument cannot cure the District Court's failure to focus on and make findings with respect to S 3E1.1(b)(1). See U.S.S.G. S 3E1.1 app. note 5. See also United States v. Marroquin, 136 F.3d 220, 223 (1st Cir. 1998); United States v. Ortiz, 63 F.3d 952, 955-56 (10th Cir. 1995). On the other hand, the record contains evidence that supports an additional one-level reduction. For example, the District Court found that Paster called 911, reported that he had stabbed his wife, provided directions to his home and the location of the weapon, remained on the phone until authorities arrived, and cooperated with authorities while the crime scene was investigated. Paster, 17 F. Supp.2d at 347-49. The District Court also concluded that "Paster has never denied that he stabbed and killed his wife." Id.6 While the District Court found that Paster "was unable to remember many of the details of the murder" when questioned by FBI agents, id. at 348, the government's psychiatrist concluded that Paster suffered from dissociative amnesia, App. at 60, an opinion that supports a finding of genuine memory loss rather than obdurate or unhelpful conduct. Finally, that the government may have been able to learn of Paster's offense independent of his assistance does not preclude an additional one-level reduction, United States v. Stoops, 25 F.3d 820, 822-23 (9th Cir. 1994); neither does the fact that Paster filed a motion to suppress. Id. The District Court's findings establish that no reasonable trier of fact could conclude that Paster was not entitled to an additional one-level reduction. See, e.g., United States v. Eyler, 67 F.3d 1386, 1392 (9th Cir. 1995). Accordingly, we reverse and

_____

6. This finding serves to distinguish this case from United States v. Chee, 110 F.3d 1489 (9th Cir. 1997), where the court affirmed denial of the additional one-point reduction because the defendant consistently denied certain alleged conduct. Id. at 1494.

14

remand for Paster to be resentenced to reflect an additional one-level reduction in his offense level.

V.

Paster's final, and most extensive, challenge is a multi-pronged one to the nine-level upward departure pursuant to Sentencing Guidelines S 5K2.8, "Extreme Conduct." That section authorizes an upward departure "[i]f the defendant's conduct was unusually heinous, cruel, brutal, or degrading to the victim." U.S.S.G. S 5K2.8. The guideline explains that "[e]xamples of extreme conduct include torture of a victim, gratuitous infliction of injury, or prolonging of pain or humiliation." Id. Here, after summarizing the evidence, the District Court concluded that some "upward departure based upon Paster's unusually heinous, cruel, and brutal conduct is warranted." Paster, 17 F. Supp.2d at 349-50. It then imposed a nine-level upward departure. Id. at 350. The departure increased the adjusted guideline range from 108-135 months to 292-365 months. The top-of-the-range 365-month sentence actually imposed is 213.5 months greater than the median of the range for base second degree murder (135-168 months), to which Paster pled guilty. As contemplated by then-Judge Becker's seminal opinion in United States v. Kikumura, 918 F.2d 1084 (3d Cir. 1990), we appraise the level of proof required by the district court, the propriety of any departure, and the reasonableness of its term. Id. at 1098.

A.

Paster first argues that the District Court erred by not articulating and applying a clear and convincing burden of proof to support the nine-level upward departure. In support of this claim, Paster cites Kikumura, 918 F.2d 1084, which established that when a departure "is sufficiently great that the sentencing hearing can be fairly characterized as `a tail which wags the dog of the substantive offense,' . . . the factfinding underlying that departure must be established at least by clear and convincing evidence." Id. at 1101 (quoting McMillan v. Pennsylvania, 477 U.S. 79, 88 (1986)). See also United

15

States v. Murray, 144 F.3d 270, 275 (3d Cir. 1998), cert. denied, ___ U.S. ___, 119 S. Ct. 254, 142 L. Ed. 2d 209 (1998). The government concedes that the magnitude of the departure here imposed, compared to a base second degree murder sentence, requires clear and convincing evidence, and that the District Court did not expressly recite the clear and convincing formula; it argues, nonetheless, that the evidence met the requisite legal standard. We agree: Incantation of the term "clear and convincing" was not necessary on this record. Kikumura, 918 F.2d at 1104.

Paster contends that the District Court not only failed to recite the proper standard; it failed to prove by clear and convincing evidence that his conduct was unusually heinous, cruel, brutal, or degrading to the victim. This argument is unconvincing. Paster never repudiated his prior admissions that he killed his wife. Nor did he dispute the extensive and gory evidence concerning the killing, including the expert pathologist's extensive and uncontradicted testimony about the sixteen stab wounds, the eight to nine penetrations of the heart area, and the eleven incisive wounds that Paster inflicted on his wife. Paster, 17 F. Supp.2d at 348-49. See App. at 189 ("This was one of the most severe cases I've seen."). This unchallenged evidence was clear and convincing proof of "extreme conduct." Kikumura, 918 F.2d at 1101.7

B.

Paster next argues that the District Court erred by enhancing his sentence for extreme conduct because the Sentencing Commission regarded second degree murder, per se, as unusually heinous, cruel, and brutal and established guidelines that adequately punish perpetrators on that assumption. According to Paster, the unusually heinous, cruel, and brutal character of his conduct was reflected in S 2A1.2, the guideline for second degree

_____

7. Citing Beardshall v. Minuteman Press International, Inc., 664 F.2d 23, 26-27 (3d Cir. 1981), Paster argues that the District Court committed plain error by not reciting the clear and convincing formula. In Beardshall, the district judge failed to instruct the jury on the applicable
burden of proof, quite a different matter.

16

murder, and in the offense level there established. His argument finds tangential support in this court's observation in Kikumura, 918 F.2d at 1118, that the attempted murder guideline "plainly accounts for the fact that attempted murder, by its very nature, involves heinous conduct." Id. The government counters that the District Court's specific factual findings support a determination that by any definition Paster's conduct was unusually heinous, cruel, and brutal. Again, we find ample support for the government's position.

By now it is familiar that when a factor is an "encouraged" basis for departure, the task of the sentencing court is to determine whether that factor is taken into account by the relevant guideline. Koon v. United States, 518 U.S. 81, 96 (1996). Unusually heinous, cruel, brutal, or degrading conduct is an encouraged factor under S 5K2.8, so the court below was obligated to assess whether unusually heinous, cruel, brutal, or degrading conduct is within the heartland of conduct encompassed by S 2A1.2. Id. at 93-96. Ordinarily, a determination of "[w]hether a given factor is present to a degree not adequately considered by the Commission" will be made "in large part by comparison with the facts of other Guidelines cases." Id. at 98. Because of the "institutional advantage" of district courts in making such factual determinations, appellate courts accord considerable deference to their departure decisions, limiting review on appeal to abuse of discretion. Id. at 98-100.

We are satisfied that the District Court exercised appropriate discretion in determining that Paster's conduct was sufficiently more heinous than conduct that constitutes the so-called "heartland" of second degree murders. Id. at 93-94. The judge specifically noted, for example, that Paster stabbed Margaret sixteen times with a butcher knife, that eight or nine of the wounds penetrated the heart area, that ten of the wounds were immediately life-threatening, and that Paster also inflicted eleven incisive wounds. Paster, 17 F. Supp.2d at 349. The judge also observed photographs of the victim that "graphically demonstrate the heinous and extreme nature of Paster's crime." Id. While the judge did not compare Paster's case

with other second degree murders, the gripping detailed testimony effectively demonstrates that Paster's crime was unusually violent and brutal. We are satisfied that the District Court did not abuse its discretion in deciding to depart for extreme conduct. See United States v. Murray, 144 F.3d 270, 275 n.7 (3d Cir. 1998), cert. denied, ___ U.S. ___, 119 S. Ct. 254, 142 L. Ed. 2d 209 (1998).

C.

In approving an extreme conduct departure, we do not overlook Paster's argument that the departure was literally inappropriate because his conduct matched none of the specific examples delineated by S 5K2.8:"torture of a victim, gratuitous infliction of injury, or prolonging of pain or humiliation." U.S.S.G. S 5K2.8. Paster argues that this list of examples is exhaustive, citing United States v. Kelly, 1 F.3d 1137 (10th Cir. 1993). However, the Kelly court ruled only that by articulating specific examples of unusually heinous, cruel, brutal, or degrading conduct, S 5K2.8 provides "objective standards for its application." Id. at 1143. This is a far cry from a ruling that the three examples listed in the guideline constitute the universe of conduct condemned by that section. Indeed, the guideline itself identifies these three examples as just that: non-exclusive examples. ("Examples of extreme conduct include . . . ." U.S.S.G. S 5K2.8 (emphasis added)). Paster's conduct was extreme even if it was not specifically branded with one of the three illustrative labels provided in S 5K2.8.

As a second prong of his challenge to the extreme conduct finding, Paster argues that his crime was no more heinous, cruel, or brutal than that recorded in six other cases. As an example, Paster again cites Kelly, 1 F.3d 1137, where the defendant choked the victim to unconsciousness, beat the victim with a tire iron, struck the victim in the neck with a jack handle, and dumped the victim's body in a pond. Id. at 1138. See also United States v. Herrera, 70 F.3d 444, 445 (7th Cir. 1995); United States v. Anderson, 5 F.3d 795, 796-97 (5th Cir. 1993); United States v. Luscier, 983 F.2d 1507, 1509 (9th Cir. 1993); United States v. Phillip, 948 F.2d 241, 244 (6th Cir. 1991); United States v. Roberson, 872 F.2d 597, 600 (5th Cir. 1989). While one

18

cannot gainsay the brutality of the conduct perpetrated in these cases, it hardly follows that Paster's conduct was less deserving of being branded "extreme."

Even if true, however, the fact that other cases involved conduct arguably more heinous, cruel, and brutal than Paster's by no means proves that the District Court abused its discretion by concluding that Paster's conduct was outside the heartland of second degree murder cases. Murray, 144 F.3d at 275 n.7. In fact, the judge made explicit findings about the heinous, cruel, and brutal nature of Paster's offense -- particularly supported by the pathologist's testimony that it was one of the most severely violent deaths he had ever documented, 17 F. Supp.2d at 349 -- thereby demonstrating an awareness of the relevant standard and a commitment to undertake a departure only when warranted. All of the foregoing considered, we affirm the District Court's decision to enhance Paster's sentence for extreme conduct.

D.

Having concluded that the District Court did not abuse his discretion by awarding a departure for extreme conduct, we turn to Paster's final argument: that the nine-level upward departure, which increased by more than seventeen years the applicable median sentence, was unreasonable. The Sentencing Commission established a 243-month spread between the median sentence for first degree murder adjusted by a two-level reduction for acceptance of responsibility (364.5) and the median sentence for second degree murder adjusted for the same two-point reduction (121.5).8 Yet the sentence levied in this second degree murder case is equal to what would be a heavy first degree murder sentence. This aspect of the sentence here imposed gives us pause.

_____

8. At base offense level 43, first degree murder carries a sentence of life
imprisonment; adjusted two levels for acceptance of responsibility, the crime yields an incarceration range of 324-405 months. Second degree murder, which has a base offense level 33, produces an incarceration range of 135-168 months; the range drops to 108-135 months when the offense level is adjusted two levels for acceptance of responsibility.

"Our review of the sentencing court's decision in this regard is deferential," United States v. Baird, 109 F.3d 856, 872 (3d Cir. 1997), cert. denied, ___ U.S. ___, 118 S. Ct. 243, 139 L. Ed. 2d 173 (1997), but this court relies upon "objective standards to guide the determination of reasonableness" -- including analogies within the guidelines themselves, Kikumura, 918 F.2d at 1110-13, and the guidance afforded by the statutory scheme that they implement. In this case, the District Court concluded, and both parties acknowledge, that "there are no provisions in the guidelines which suggest an analogy from which to determine the appropriate level of upward departure." Paster, 17 F. Supp.2d at 350. Nor does our independent search for such analogies yield a plausible one.9

Paster proposes as an alternative approach an increase of the offense level by analogy to the defendant's criminal history category. See, e.g., United States v. Ferra, 900 F.2d 1057, 1061-64 (7th Cir. 1990). He notes that even at Category VI -- the maximum -- his pre-departure offense level of 31 would yield an incarceration range of 188-235 months, some 104-130 months fewer than he actually received.

We find the criminal history analogy inappropriate here. As the Kikumura court observed, guidelineS 4A1.3 permits a departure "[i]f reliable information indicates that the criminal history category does not adequately reflect the seriousness of the defendant's past criminal conduct or the likelihood that the defendant will commit other crimes . . . ." 918 F.2d at 1112. In this case, the government did not argue, and the District Court did not find, that Paster's criminal history category misrepresented the seriousness of his past criminal conduct (there was no record of any), or the likelihood that he would engage again in the arguably

_____

9. For example, S 2A2.1 and S 2A2.12 of the guidelines fix 28 and 16 as the base offense levels for assault with intent to commit murder and aggravated assault, respectively. Each offense is subject to specific upward adjustments for particular offense characteristics, such as five levels for aggravated assault if a firearm is used. Neither these specific offenses, nor the scheduled adjustments, provide a useful analogy to the extreme conduct departure which is to be measured here.

20

aberrant conduct at issue here. Our appraisal of the record confirms these conclusions.

Finding no acceptable analogy in the guidelines, the District Court surveyed what it considered to be analogous case law. The District Judge collected two cases that approved five-level upward departures, see Herrera, 70 F.3d 444, Kikumura, 918 F.2d at 1113, one decision that affirmed a ten-level upward departure, United States v. Pergola, 930 F.2d 216 (2d Cir. 1991), and one that upheld an eleven-level upward departure, Roberson, 872 F.2d 597. From these raw numbers ranging from five to eleven the District Court extrapolated nine. Paster argues that the four cases cited by the District Court are inapposite because they involved more severe offenses, and because the upward departures were based only in part on the respective defendants' "extreme conduct." The government defends the District Court's approach, and at oral argument directed us to United States v. Morrison, 153 F.3d 34 (2d Cir. 1998), where the court upheld a fourteen-level upward departure.

Guidelines construct a bare framework for sentencing decisions, and the interstices permit courts to use a common law approach to fashion particular sentences. However, notwithstanding the substantial deference owed the District Court, we have two problems with the case law methodology used here. First, the District Court cited the several cases without critical analysis of the particular extreme conduct and other grounds for departure in those cases compared with the nine-level departure here solely for extreme conduct; the District Court simply concluded"that a nine level upward departure for Paster's extremely brutal conduct is warranted." Paster, 17 F. Supp.2d at 350.

We question whether on closer analysis extrapolation from the sentences imposed in the four cases referenced by the District Court -- and the fifth cited by the government at oral argument -- would support a nine-level extreme conduct departure here. For example, in Roberson, 872 F.2d 597, the court affirmed an eleven-level departure, but recognized that the district court based the upward departure on three discrete grounds, only one of which was extreme conduct pursuant to S 5K2.8. Id. at 602. See also

Morrison, 153 F.3d at 51 (affirming fourteen-level departure that was an accumulation of separate two- and three-level enhancements linked to consequences suffered by ten different victims). The Pergola court approved a ten-level departure based, not upon "extreme conduct" (S 5K2.8), but upon "extreme psychological injury" (S 5K2.3). Pergola, 930 F.2d at 218. Finally, both Kikumura and Herrera involved upward departures that were only five levels, and authorized by more than one guideline. Kikumura, 918 F.2d at 1119; Herrera, 70 F.3d at 447. We are not satisfied that these cases adequately justify the nine-level upward departure at issue here.

There remains the question raised by the convergence of the sentence imposed here with the guidelines' prescription for first degree murder. To recapitulate, Paster was indicted for first degree murder, the elements of which are "the unlawful killing of a human being with malice aforethought." 18 U.S.C. S 1111(a). After the District Court denied Paster's suppression motion, Paster agreed to, and the court accepted, a plea of guilty to second degree murder. The guilty plea spared Paster, his family, the family of his late wife, the government, and the court from the anguish which trial of this ugly case would have entailed; it also reduced the severity of the applicable sentence range to which Paster was exposed. See 18 U.S.C. S 1111(b). See also U.S.S.G. SS 2A1.1, 2A1.2. In the colloquy about the plea agreement, the probation officer and the government advised that the likely sentencing range would be 168-210 months, a range consistent with base second degree murder and a two-level enhancement. Tr. of hearing of 11/19/97, at 13-14.

The statutory maximum for both first and second degree murder is life imprisonment, except that in special circumstances the death penalty may be imposed upon a person convicted of first degree murder. 18 U.S.C. S 1111(b). However, the guideline range for a defendant guilty of first degree murder with a criminal history of I who, after a two-point reduction for acceptance of responsibility has an offense level of 41, is 324-405 months imprisonment. The guideline range for a defendant guilty of second degree murder with a criminal history of I and a

22

two-point reduction for acceptance of responsibility is 108-135 months imprisonment.

A prime objective of the Sentencing Guidelines was to eliminate or, at least reduce, disparity in the sentencing of similarly situated defendants. See U.S.S.G. Ch. 1, Pt. A, 3. As the Sentencing Commission has stated, "Congress sought reasonable uniformity in sentencing by narrowing the wide disparity in sentences imposed for similar criminal offenses committed by similar offenders." Id. As a corollary of this guideline policy, however, the Commission recognized that defendants differently situated should suffer different sentences because "Congress sought proportionality in sentencing through a system that imposes appropriately different sentences for criminal conduct of differing severity." Id. See also United States v. Katora, 981 F.2d 1398, 1411 n.12 (3d Cir. 1992) (Becker, J., concurring in part and dissenting in part) ("The notion of disparity comprehends not only treating similarly situated defendants differently, but also treating defendants who are dissimilarly situated in some relevant way the same."). "Often the best way to test whether a particular degree of departure is appropriate is to use other provisions of the Guidelines as benchmarks." Herrera, 70 F.3d at 446.

The vice of the nine-level upward departure imposed on Paster is that he has incurred for second degree murder a sentence that would be appropriate for first degree murder adjusted two levels for acceptance of responsibility. Thus, if the government had required Paster to plead guilty to first degree murder in order to escape the death penalty, 10 and he enjoyed a two-level reduction for acceptance of responsibility (as he did here), he would have faced a sentence in the range of 324-405 months,11  the median of

_____

10. While the record reflects only that the government ultimately decided not to seek the death penalty, see App. at 119-20, 319, it had statutory authority to do so. 18 U.S.C. S 1111(b).

11. First degree murder carries a base offense level of 43; assuming a two-level reduction for acceptance of responsibility, an offense level of 41
yields a sentence of 324-405 months for a defendant in criminal history category I. The applicable range would drop to 292-365 months if a three-point reduction for acceptance of responsibility were awarded. See supra IV.

which is the actual sentence that Paster received. 12 This lack of disparity between Paster's actual sentence and one he could have received had he pleaded guilty to, or been convicted of, a more serious crime distorts proportionality, a critical objective of the Sentencing Guidelines. See U.S.S.G. Ch. 1, Pt. A, 3.

VI.

Accordingly, we will affirm the District Court's denial of departures for aberrant behavior and victim provocation. However, we will remand for resentencing to reflect an additional one-level reduction for acceptance of responsibility. We also will remand with directions to the District Court to reconsider the nine-level upward departure for extreme conduct after closer examination of the relevant court decisions and for consideration of the proportionality concerns raised by the coincidence of the second degree murder sentence and the prescribed sentence for first degree murder.

_____

12. Had Paster pursued an insanity defense, as he originally intended, been convicted of first degree murder, and received a two-point reduction for acceptance of responsibility, he likewise would have been exposed to an incarceration range of 324-405 months. See U.S.S.G. S 3E1.1, comment 2 ("Conviction by trial . . . does not automatically preclude a defendant from consideration for [an acceptance of responsibility] reduction."). See also United States v. Fells, 78 F.3d 168, 172 (5th Cir. 1996); United States v. Barris, 46 F.3d 33, 35 (8th Cir. 1995) ("[D]efendant who goes to trial on an insanity defense, thus advancing an issue that does not relate to his factual guilt, may nevertheless qualify for an acceptance-of-responsibility reduction").

SLOVITER, Circuit Judge, concurring.

I join in Parts I through IV of the opinion. I also concur in Part V, but note that I would ordinarily agree with the government with respect to the nine-level upward departure. The District Court's decision to depart is entitled to great deference. As the Court stated in Koon v. United States, 518 U.S. 81 (1996), "[a] district court's decision to depart from the Guidelines . . . will in most cases be due substantial deference, for it embodies the traditional exercise of discretion by a sentencing court." Id. at 98. See also United States v. Kikumura, 918 F.2d 1084, 1110 (3d Cir. 1990). However, here the majority has raised an issue as to the relationship between the Guideline governing first-degree murder and that governing second-degree murder that fairly requires some further attention by the District Court. Therefore, I concur with its decision to remand, as long as it is understood that the District Court retains the discretion to depart upwards nine levels again should it fully explain why it determined to do so.

COWEN, Circuit Judge, concurring in part, and dissenting in part.

I join in all of the majority's opinion except for Part III, which affirms the District Court's denial of Paster's motion for a downward departure based on aberrant behavior. Because the District Court's refusal to depart on that ground was predicated on a misapprehension of the applicable legal standard for an aberrant behavior departure, I would remand for re-sentencing so that the District Court could reconsider the motion under the correct standard.

In United States v. Marcello, 13 F.3d 752 (3d Cir. 1994), this court, consistent with every other circuit court to have considered the issue, recognized that the Guidelines permit a sentencing court to downwardly depart in a case where a defendant's criminal conduct can fairly be characterized as a "single act[ ] of aberrant behavior." Id. at 760 (quoting U.S.S.G. Ch. 1, Pt. A, intro. comment P 4(d)). The courts of appeal are not in agreement, however, as to the correct definition of aberrant behavior. A minority of circuits have adopted a "totality of the circumstances test" that, as its name implies, allows a sentencing court to consider a multitude of factors, including a defendant's lack of a criminal record and his prior good deeds, in assessing whether a downward departure for aberrant behavior is appropriate. See Zecevic v. United States Parole Commission, 163 F.3d 731, 734–35 (2d Cir. 1998); United States v. Grandmaison, 77 F.3d 555, 564 (1st Cir. 1996).1 Under the totality test, as explained by its proponents, " `when all is said and done, the conduct in question must truly be a short-lived departure from an otherwise law-abiding life.' " Id. at 735 (quoting United States v. Colace, 126 F.3d 1229, 1231 (9th Cir. 1992)).

_____

1. The Zecevic court listed the following factors that courts have considered in applying totality of the circumstance test: "(1) the singular
nature of the criminal act; (2) the defendant's criminal record; (3) psychological disorders form which the defendant was suffering at the time of the offense; (4) extreme pressures under which the defendant was operating; (5) letters from friends and family expressing shock at the defendant's behavior; and (6) the defendant's motivations in committing the crime." 163 F.3d at 735.

We considered and rejected the totality approach in Marcello. We reasoned that a defendant's criminal history, or lack thereof, is already incorporated into the Guidelines' sentencing formula, and that it would be inappropriate to factor it in once again under the guise of aberrant behavior. Marcello, 13 F.3d at 761.2 Instead, we adopted the majority view, first articulated by the Seventh Circuit in United States v. Carey, 895 F.2d 318, 325 (7th Cir. 1990), which focuses the aberrant behavior inquiry on the criminal conduct itself, not on a defendant's "high standing in the community and his lack of prior conviction." Carey, 895 F.2d at 324. Under this approach, a sentencing court considering an aberrant behavior departure must decide whether a defendant's criminal behavior was " `a spontaneous and seemingly thoughtless act rather than one which was the result of substantial planning.' " Marcello, 13 F.3d at 761 (quoting Carey, 895 F.2d at 325). The reason for focusing on whether a defendant's criminal act is spontaneous and unplanned is that " `an act which occurs suddenly and is not the result of a continued reflective process is one for which the defendant may be arguably less accountable.' " Id. Applying this standard in Marcello, we affirmed the district court's conclusion that the defendant, who over a one-week period structured bank deposits to evade currency transaction reporting requirements, was not entitled to an aberrant behavior departure because some pre-planning was required to commit the offense. Id. Similarly, in Carey, the Seventh Circuit held that an aberrant behavior departure was not allowed where the defendant had engaged in a check-kiting scheme over a fifteen-month period. 895 F.2d at 324 35. See also United States v. Glick, 946 F.2d 335 (4th Cir. 1991) (no aberrant behavior departure where defendant sent five separate letters containing misappropriated information over the course of ten weeks); United States v. Garlich, 951 F.2d 161 (8th Cir. 1991) (no aberrant behavior

_____

2. This conclusion has since been bolstered by the Supreme Court's recognition in Koon v. United States, 518 U.S. 81, 113 (1996), that the Guidelines specifically prohibit a downward departure on the ground that a Criminal History Category I fails to reflect a particular defendant's
low likelihood of recidivism.

27

where defendant planned and executed a fraudulent financing scheme over a one-year period).

In stark contrast to those cases, all of which involved offenses that had been planned for days, weeks or even months, in this case the District Court found as a matter of fact that "[u]p until a few minutes prior to the stabbing, Paster had no plan to kill his wife." Paster, 17 F. Supp. 2d 345, 348 (M.D. Pa. 1998). The court also noted that "there are indications that the murder was spontaneous." Id. at 351. Despite these findings, however, the District Court concluded that it did not have the authority to depart for aberrant behavior. The court explained:

> The murder was not committed in a thoughtless manner. Thoughtlessness is an essential element under Marcello, Thoughtfulness [sic] is missing in this case. Paster had ample time in the minutes preceding the stabbing to think about whether to murder his wife. Further, the number of times Paster stabbed his wife indicates that he thought about the act as it was being done. There is no authority to depart on the basis of aberrant behavior under Marcello. We will deny Paster's request for a departure on the basis of aberrant behavior.

Id.

The problem with this reasoning is that, under the District Court's definition of the term "thoughtless," a defendant who has any opportunity to consider his crime, no matter how fleetingly, would be ineligible for a departure based on aberrant behavior. Were this a correct statement of law, however, there would be no point in having an aberrant behavior departure in the first place because no defendant would ever qualify for it, save perhaps a hypothetical one concocted for a law school examination. In real life, those who commit crimes almost always have some opportunity, even if for only a minute or two, but typically much longer than that, to consider their actions. See Zecevic, 163 F.3d at 734 ("If actions taking place over such a short period can be deemed to include sufficient planning and preparation to remove them from the realm of the `spontaneous and thoughtless,' this standard is limited indeed.").

28

Consider, for instance, the defendant in United States v. Russell, 870 F.2d 18 (1st Cir. 1989), a case which is often cited as an "excellent example" of aberrant behavior, particularly among those courts employing the "spontaneous and thoughtless" test. See , e.g, Carey, 895 F.2d at 325. The defendant was a Wells Fargo armored truck driver and his partner was the truck's messenger. A bank mistakenly gave the pair an extra bag of money containing $80,000, which both men, yielding to temptation, decided to keep for themselves. A week later, however, Russell confessed the crime, returned the money that he had kept, and cooperated with authorities. Under the definition of "thoughtless" adopted by the District Court, Russell would have been ineligible for an aberrant behavior departure because he undoubtedly had some opportunity, though perhaps not very long, to contemplate whether or not to keep the bank's money.

In my view, the "spontaneous and thoughtless" test does not require sentencing courts to literally determine whether a defendant, at any time prior to his offense, had time to think about his criminal conduct. The answer to that question will invariably be yes. Instead, the test asks more generally whether the defendant's crime was the product of planning and deliberation or, as we stated in Marcello, "a continued reflective process." 13 F.3d at 761 (quoting Carey, 895 F.2d 325). If it was, then an aberrant behavior departure will be unavailable. If it was not, a district court should retain the discretion to depart. See United States v. Winters, 105 F.3d 200 (5th Cir. 1997) (noting that "one isolated assault" could be considered aberrant behavior, but not a subsequent effort to conceal the offense by coercing a witness to give false testimony). Applying that test to the facts of this case -- where the defendant did not plan the murder, the entire episode took place over the course of no more than a few minutes, and the defendant confessed to the crime within minutes of its commission and made no attempt to conceal his culpability -- I would hold that the District Court had the discretion to depart based on aberrant behavior, and that the District Court's

29

conclusion that it had "no authority" to award the departure was an error of law necessitating a remand.3

The majority endorses the District Court's holding that Paster is not eligible for an aberrant behavior departure because he did not act in a "thoughtless" manner. In particular, the majority relies on the District Court's observations that Paster had time in the minutes preceding the murder to think about his actions, and that Paster stabbed his wife so many times that he must have been thinking about the murder while he was committing it. Maj. Op. at 8-9. In my view, neither of these reasons support the conclusion that Paster did not act "thoughtlessly." As to the latter, if a defendant who is conscious of his actions during the commission of a crime is deemed not to have acted aberrantly, then the departure will only be available to that minuscule class of defendants who are liable for crimes committed by involuntary reflex, and perhaps also to those who are in a hypnotic state at the time of their offense. Surely this is not what the Sentencing Commission or the Marcello panel intended when they recognized that "single acts of aberrant behavior" may justify a downward departure. U.S.S.G. Ch. 1, Pt. A, intro. comment P 4(d). That Paster may or may not have thought about whether to murder his wife in the moments before the stabbing also should not be a sufficient basis to disqualify him for an aberrant behavior departure. The murder of Dr. Bostrom, while undoubtedly a brutal and heinous crime, was certainly not the product of any meaningful deliberation or reflection on the part of Paster; to the contrary, all

_____

3. The majority asserts that the District Court's statement that it had "no authority to depart on the basis of aberrant behavior under Marcello," Paster, 17 F. Supp. 2d at 351, did not really mean what it said (i.e., that the District Court thought it lacked discretion to grant Paster's downward departure motion). Instead, the majority posits, the statement merely reflects the District Court's determination that "the facts of this case applied to the principles announced in Marcello do not qualify Paster for an aberrant behavior departure." Maj. Op. at 11. I cannot agree. We must presume that the able and experienced District Judge meant precisely what he said in concluding that he had "no authority" to grant Paster's downward departure motion. The majority's effort to recast the District Court's decision as an exercise of discretion strains credulity.

indications are that Paster acted spontaneously and in response to a series of deeply painful revelations from his wife. Under these circumstances, the majority's conclusion that Paster failed to act in a "thoughtless" fashion can only be justified by the most literal and wooden definition of that term.

None of this is to say, however, that an aberrant behavior departure was required in this case. Not every crime that is committed spontaneously and without prior planning merits a reduced sentence. If after analyzing the factual record, for example, the District Court concluded that the murder of Dr. Bostrom was the culmination of a long-standing pattern of domestic violence on the part of Paster, then a departure based on aberrant behavior would have obviously been inappropriate. A departure would have also been unwarranted if the District Court concluded that the lack of planning in this case was sufficiently accounted for by the base offense level for second-degree murder. U.S.S.G. S 2A1.2; see generally Koon v. United States, 518 U.S. 81, 95-96 (1996). But the District Court never reached these issues. It summarily concluded that it had "no authority" under Marcello to depart because Paster's criminal act was not committed in a "thoughtless" manner. Because that conclusion was based on an erroneous and overly restrictive understanding of the legal standard governing an aberrant behavior departure, we should allow the District Court to reconsider this issue at re-sentencing.

* * *

Finally, I offer a brief comment concerning the District Court's grant of a nine-level departure for extreme conduct, which nearly tripled the sentence that Paster received. Judge Oberdorfer has carefully identified the reasons why the structure of the Guidelines and the applicable case law render the magnitude of that departure unreasonable. I shall not repeat them here. I add only that at re-sentencing, for those same reasons, the District Court should not again impose a nine-level upward departure. While Judge Sloviter is of course correct that the District Court's decision to depart is entitled to great deference, it is equally true that:

> A judge may not say: "I have decided to depart, so I now throw away the guidelines." The guidelines are

31

designed to bring openness and consistency to sentencing, to even out the effects of different judges' perspectives on desert and deterrence. . . . Unless there is discipline in determining the amount of departure, however, sentencing disparity will reappear.

United States v. Ferra, 900 F.2d 1057, 1061-62 (7th Cir. 1990) (citation omitted). In my view, the nine-level departure imposed in this case is emblematic of the very sentencing disparities that the Guidelines were designed to counter. It should not be repeated.

A True Copy:
Teste:

Clerk of the United States Court of Appeals
for the Third Circuit

32