WIENER, Circuit Judge,
joined by VANCE, District Judge, specially concurring:
Having concluded as a unanimous panel that the record contains sufficient evidence to support Harris’s conviction and that the district court’s decision to depart downwardly evinced no abuse of discretion, we now address the extent of the court’s downward departure. Based on (1) the several factors that the district court should have considered but did not, (2) the pervasiveness of overt ethnic animus displayed by Defendant-Appellant Harris before, during, and after his assault on Lopez, and (3) other facts included in the PSR, Judge Vance and I conclude — and Judge Garwood disagrees, as evidenced by his dissent that follows — that the district court abused its discretion when it departed downwardly to such an extent that the sentence it imposed equaled only 15% of the Guidelines minimum for the offense of conviction.
I. ANALYSIS
A. Standard of Review
When it comes to downward departures at sentencing, we afford broad discretion to the district court.[1] No abuse of that discretion exists “if the judge provides acceptable reasons for the [downward] departure and the degree of depar *877 ture is reasonable.”[2] We reiterate that we find no abuse of discretion in the court’s decision to depart downwardly; our concern here is solely with the reasonableness of the extent of a departure that we perceive to have resulted from a sentencing court’s analysis that was neither complete nor balanced.
B. Factual Background
We adopt the version of the facts included in Judge Garwood’s thoughtful opinion, but we supplement it with the crucial testimony regarding Harris’s ethnic animus. True, discriminatory animus was not alleged in the indictment, so it cannot be said that his conviction resulted from a jury finding beyond a reasonable doubt that Harris’s actions were motivated by such animus. Nevertheless, his ethnically derogatory assertions, of which there is a plethora of evidence in the record and the PSR,[3] remain relevant to his sentencing. Even though it was not charged or proved that his actions were driven by ethnic animus, no picture of this case is complete without inclusion of Harris’s extensive, ethnically bigoted statements. More to our point, despite Harris’s anti-Mexican epithets being well documented in the PSR and in the record, the district court did not so much as mention these statements or this factor in its departure explication.
As noted in Judge Garwood’s opinion for our panel, the sequence of facts is not completely free from ambiguity because differing versions appear in the PSR, one detailed and the other abbreviated. In its detailed recitation of the Offense Conduct, the PSR fists the facts in the sequence the panel credits; in its abbreviated summary of the facts, in the section entitled “Factors That May Warrant Departure,” however, the PSR fists (mistakenly, perhaps out of haste) the facts in a slightly different sequence. We continue to employ the sequence set forth in Judge Garwood’s opinion, noting in particular that Officer Trimm did not pepper spray Lopez, and that Lopez did not kick Officer Trimm, until after Harris had clubbed Lopez in the head.[4]
During sentencing, the district court apparently failed to recognize this internal inconsistency in the PSR and relied on the summarized sequence of facts. Unfortunately, this resulted in the court’s short-circuiting of the government’s attempt to object to that version.[5] Again, it is the *878 more complete and accurate version of the facts that appears in the lengthy, detailed portion of the PSR and in Judge Garwood’s opinion.
C. Reasonableness of the Extent of Departure
We do not take the position that the extent of the downward departure is per se unreasonable. At the very least, however, a departure resulting in an 85%, 16 level reduction below the applicable guideline range has to be a red flag to any reviewing court, provoking at a minimum an inquiry into the reasonableness of so extensive a departure. And, when all the circumstances and facts in the record of this case are exposed to the sunlight, the degree of the district court’s departure, based as it was almost entirely on victim provocation, is undeniably disproportionate to that provocation.
During sentencing, the district court stated:
One of the elements that the guidelines called to be considered in deciding the extent of a sentence reduction under 5(k) [sic] 2.10 is the persistence of the victim’s conduct and any efforts by the defendant to prevent confrontation. Well, if there’s ever been a persistent victim who egged a situation on and continued, after being given every opportunity to stop his provoking conduct, then this victim had.
The court is only partially correct: The persistence of the victim’s conduct is a factor to be considered under 5K2.10. It certainly is not, however, the only factor to consider under 5K2.10. In relevant part, 5K2.10 reads:
In deciding the extent of a sentence reduction, the court should consider:
(a) the size and strength of the victim, or other relevant physical characteristics, in comparison with those of the defendant;
(b) the persistence of the victim’s conduct and any efforts by the defendant to prevent confrontation;
(c) the danger reasonably perceived by the defendant, including the victim’s reputation for violence;
(d) the danger actually presented to the defendant by the victim; and
(e) any other relevant conduct by the victim that substantially contributed to the danger presented.[6]
Our review of the sentencing transcript confirms that the district court focused solely on the second factor, factor (b), to the total exclusion of all others. Even though we do not insist that a sentencing court engage in a talismanic incantation of each listed factor, the sentencer’s focusing exclusively on but one factor to the complete disregard of all others is a substantial first step on the road to abuse of discretion.
Under the first 5K2.10 factor, the sentencing court should compare the size and strength of the victim to those of the defendant.[7] Harris is 6’2” and 325 lbs.; in *879 contrast, Lopez is approximately 5 feet tall and weighed, at most, 140 lbs — more than a foot shorter than Harris and less than half his weight.
Regarding the third and fourth factors under § 5K2.10, we note that, at the time the offense occurred — which was after the victim had been arrested on a public drunkenness charge — Lopez was already handcuffed and in police custody, having been locked in the caged rear compartment of the patrol car. The fourth factor expressly instructs the sentencing court to consider the actual danger presented to the defendant. Having been restrained and confined (and being unarmed and much smaller than Harris), Lopez was at most a danger to himself (when he was banging his head) and to property (when he was thrashing about and kicking the police car).[8] But, importantly, Lopez was never a danger to the public and was not a danger to Harris until after Harris returned to the patrol car and opened its door.[9] And, even at that point, given the handcuffs restraining Lopez and Harris’s size and the weapons he possessed, it is far from certain that Lopez ever presented an actual danger to Harris.
Neither is there any indication in the record or the PSR that Lopez had a reputation for violence or that Harris believed or suspected that Lopez had any such propensity. Moreover, both the PSR and Judge Garwood’s opinion confirm that Harris’s return to the vehicle — well after Lopez was in custody and subdued — was all about Harris’s anger at the situation and his loss of “composure as a law enforcement officer.”[10]
Finally, even the one § 5K2.10 factor that the district court did discuss — the second factor, persistence of provocative conduct and avoidance of confrontation — is not discussed completely. Our review of the detailed version of the facts that the sentencing court should have used reveals that it relied on a sequence of events that is not logically applicable to support its finding that Lopez’s conduct was persistent and contributed significantly to Harris’s behavior. According to the summary version of the facts presented of the PSR, Harris hit Lopez on the head with the baton (the offense behavior) after Lopez had thrashed about in the car and after Lopez had kicked Trimm and received the pepper spray.[11] In the credited version of the facts, which accords with trial testimony and the detailed portions of the PSR, the only provocative behavior contributing significantly to Harris’s conduct was Lopez’s thrashing about in the car and banging of his own head on the plexiglass. As *880 Harris hit Lopez on the head before Lopez kicked Trimm, Lopez’s kicking of Trimm could not have contributed to the provoking of Harris’s behavior (and may have actually been a fearful response by Lopez to being hit in the head). Applying the version of the facts presented by the government and by the unanimous panel opinion, some of Lopez’s most significant behavior could not have possibly contributed to provoking Harris’s conduct because they simply had not yet occurred.
Including in the sentencing calculus the number of times that the officers returned to the party as part of Lopez’s persistent behavior also defies logic. The behavior of a collective group of partygoers, necessitating repeated visits by police officers, cannot reasonably be laid entirely at the feet of but one of the party’s attendees and then be treated as though the group’s collective “persistent provocative behavior” was his alone.
In addition, the record evidence confirms that Harris made no effort whatsoever to avoid or prevent a confrontation. To the contrary, he initiated it. The PSR indicates that Officer Stacy advised Harris that he (Stacy) was going to his vehicle to obtain a device that they could use to restrain Lopez’s feet. Instead of consulting with or waiting for Officer Stacy, Harris proceeded to the squad car, opened its door, and began striking Lopez with the baton.
Neither is this case so extraordinary as to eviscerate the Guidelines of all applicability. Even if the circumstances militate against assessing the full Guideline’s recommendation of nine years and militate in favor of a downward departure, the imposition of a prison term equal to only one-seventh of the minimum Guideline sentence would require strikingly different circumstances than those that are presented by this case. Neither the Guidelines nor precedent give us firm guidance as to precisely what constitutes a “reasonable” departure, but our search of the case law produced not a single case with a departure nearly as extensive as the one granted to Harris, either in percentage or number of offense levels.
In Koon, the Rodney King criminal case, the Supreme Court did not expressly rule on the “reasonableness” of the departure but did approve, based on the abuse of discretion standard, the district court’s downward departure of 5 levels pursuant to 5K2.10 (the same victim provocation grounds that the district court articulated for its departure here). The victim’s conduct in that case (high speed drunk driving; endangering lives in a car chase; continued and possibly dangerous resistance to arrest) was far more provocative and egregious than Lopez’s (thrashing about in the back seat of a police car after being restrained and confined; hitting his own head against a plexiglass barrier while restrained; kicking at police officers when they opened the door). Yet the number of offense levels by which the district court departed in assessing Harris’s sentence is almost three times the number by which the sentencing court departed downwardly in Koon.[12]
In Yellow Earrings,[13] the Eighth Circuit affirmed a downward departure pursuant to 5K2.10, approving a sentence of 15 months, and a departure of 8 offense levels, even though the Guidelines range for the offense level of 22 was 41 to 51 months (15 months represents a 63% departure from the minimum guideline sentence of 41 *881 months).[14] In Yellow Earrings, where the provoked defendant (a woman) was standing trial for stabbing the “victim” (the man who provoked her), the court noted that the victim (1) had publicly humiliated the defendant, (2) had attempted to force her to engage in sexual intercourse, (3) was known to be violent when under the influence of alcohol, (4) was bigger and stronger than the female defendant, and (5) had the advantage of being in his own private residence at the time of the incident.[15] Like King’s, this conduct was much more provocative than was that of Lopez in the instant case.
The sentencer here should also have considered the fact that police are often called to disrupt loud parties; and frequently, as for example with college fraternity parties, police must make repeated trips to the scene before the noise level is reduced sufficiently and permanently. The inclusion of Lopez’s participation in a raucous party as part of his extended course of provocative conduct skews any comparison to Rodney King’s conduct. Put simply, we fail to see how Lopez’s participation as one of many Mexican-American partygoers at a Cinco de Mayo party can reasonably be included in the calculus for finding conduct that “contributed significantly to provoking the offense behavior,” as required by 5K2.10. There is no indication that Lopez was anything other than one of many revelers who together made repeated police visits necessary.
Furthermore, as Judge Garwood’s opinion for our panel notes, even though Lopez eventually pleaded guilty to a single count of resisting arrest, he initially submitted, calmly and without incident, to being arrested, handcuffed, and placed in the squad car. All reasonably related provocative actions occurred after Lopez was handcuffed and confined in a police car.[16] As we stated in United States v. Clayton, “[w]e think that an underlying consideration in applying the guideline [§ 3A1.3] is that the physical restraint of a victim during an assault is an aggravating factor that intensifies the wilfulness, the inexcusableness and reprehensibleness of the crime and hence increases the culpability of the defendant.”[17] Here, in departing so extensively, the district court appears to have ignored the wilfulness and heightened culpability of defendant Harris.
Given (1) the enhancement of Harris’s sentence for striking the restrained victim, (2) the non-extraordinary nature of the case, and (3) the sentencing court’s single-pointed focus on but one of the five listed factors of 5K2.10, we conclude that departing downwardly 85% is an abuse of discretion, necessitating a remand for resentencing.
Nevertheless, even if the foregoing reasons (which alone satisfy us that vacatur is mandated) were not deemed sufficient to warrant vacatur, the additional contextual factors detailed in the record — (1) Harris’s personal history and (2) his extreme ethnic animus — push the extent of this departure well beyond the borders of reasonableness. First, as we are here dealing with the conduct of a police officer in the course of his official duties, consideration of Harris’s employment record may be relevant despite the policy statement in U.S.S.G. § 5H1.5 to the contrary.[18] Even so, the *882 district court’s mention of Harris’s employment record and the letters of community support — to the complete exclusion of the other relevant personal history facts in the PSR — contributes to the conclusion that discretion was abused. Albeit unscoreable for CHC purposes, one example of a relevant matter left unaddressed by the district court is Harris’s 1975 guilty plea in state court to a charge of harassment by telephone. Another example is his having been arrested and charged with disturbance or assault in 1993 (which charges were admittedly dropped eventually by the complainant). A third example is not the fact that Harris was twice married and twice divorced, but that both divorce decrees specified that Harris was abusive, violent, and cruel to his spouses.
Finally, judging from the sentencing transcript and Judge Garwood’s opinion for our unanimous panel, the district court failed totally to- consider two additional factors, both related to Harris’s ethnic animus. First, the record shows that in his conversation with FBI agents during that agency’s investigation some nine months after the incident took place, Harris expressed his belief that Mexicans do not have the same rights as “real Americans” and stated that if the same situation were presented again, he would again strike Lopez. An 85% percent departure from the minimum guideline sentence does not adequately punish an openly bigoted Caucasian defendant who shows no remorse for assaulting an Hispanic victim, especially one who literally heralds his own recidivist potential.
Second, the PSR, the trial testimony, and the government’s brief detail multiple instances during which Harris made known his hatred for Mexicans or Mexican Americans, his unrepentant beliefs about the relative rights of Mexican Americans, and his continued belief in the correctness of his actions.[19] Even though Harris was never indicted for or convicted of assaulting Lopez because of ethnic animus, the court’s excluding this evidence from its sentencing colloquy omits the larger point that Harris’s documented comments regarding Mexicans before, during, and after his assault on a handcuffed Mexican arres-tee is relevant conduct for sentencing purposes. Although it is generally within the district court’s discretion to designate what it considers to be relevant conduct, in this case, the court’s exclusion of a continuous pattern of overt bigotry from Harris’s relevant conduct produces a miscarriage of justice. Completely ignoring Harris’s ethnically intolerant attitudes and confirmatory statements obscures the true and complete picture of all that took place on that night. Without addressing these facts, the district court could not take an accurate measure of the true extent of Harris’s culpability.
We remain ever mindful of the discretion afforded to the district court in sentencing matters. Nonetheless, we cannot accept that, under all these circumstances, the sentencer’s skewing of the § 5K2.10 analysis through, inter alia, the total disregard of Harris’s ethnic animosity is a reasonable exercise of discretion. As a result, the extent of the court’s downward departure too is unreasonable. - We therefore vacate the extent of that departure (and thus Harris’s sentence) and remand the case to the district court with instructions to resentence Harris after giving due consideration to all aspects of the multi-factor analysis required by the Guidelines, including, in the process, reconsideration *883 all § 5K2.10 factors, in a manner consistent with this opinion.
II. CONCLUSION
For the foregoing reasons, we affirm Harris’s conviction and the district court’s decision to depart downwardly, but we hold the extent or degree of the departure not to be reasonable. This in turn mandates that we vacate Harris’s sentence and remand to the district court for resentenc-ing consistent with this opinion.
Conviction AFFIRMED; sentence VACATED; case REMANDED for resen-tencing, with instructions.

. Koon v. United States, 518 U.S. 81, 116 S.Ct 2035, 135 L.Ed.2d 392 (1996); United States v. Alvarez, 51 F.3d 36, 41 (5th Cir.1995).

. United States v. Nevels, 160 F.3d 226, 229-30 (5th Cir.1998) (emphasis added).

. As detailed by the Probation Officer in the PSR, Harris repeatedly made derogatory comments regarding Mexicans before, during, and after the incident leading to his arrest. For example, (1) when calling for backup, he advised the dispatcher to tell the deputies to bring their nightsticks because a "bunch of wetbacks” were having a party; (2) Harris told the EMT Officer on arrival that he (Harris) had knocked the "shit” out of Lopez and that Mexicans were not going to take over the town; (3) during an investigative interview with the FBI after the incident, Harris told the FBI that Mexicans did not have the same rights as "real Americans” and asked the FBI to help get the "damn” Mexicans out of his town.

. See Judge Garwood’s opinion, Facts and Proceedings and note 12.

. During the sentencing hearing, in response to the court’s query regarding the PSR, the government answered "[tjhere are two misstatements arising in the presentence report, one particularly goes to victim provocation. Those have come out since our earlier day, as we received the trial transcript ... [referring the fact the Trimm was kicked after Harris’s actions] ... That wouldn't constitute provocation for Mr. Harris’s action.” That answer prompted the following colloquy with the court:
Court-. ... Did you file any objection to the factual statements contained in the presen-tence report 10 days before trial, before sentencing?
*878 [Government]'. No, Your Honor. Those arose when we received the trial transcript and had the opportunity to—
Court: So those objections are untimely. There are no objections to the factual statements filed with the Court in accordance with the Court's rules—
Government: Excuse me, Your Honor. We did actually state the objection — we did note the problem with Mr. Trimm’s testimony in our papers.
Court: Well, did you do it in the form of an objection?
Government: No, Your Honor.
Court: There are no objections filed to the factual statements contained in the presen-tence investigative report so the Court adopts those as its findings of fact.

. U.S.S.G. § 5K2.10 (emphasis added).

. See, e.g., United States v. Yellow Earrings, 891 F.2d 650, 653-54 (8th Cir.1989)(noting *879 all five factors and discussing the relative size and strength of the victim and defendant).

. Cf. United States v. Paster, 173 F.3d 206 (3d Cir.1999) (denying a 5K2.10 departure on the grounds that, although the victim’s comments to the defendant about her affairs with other men and her ability to contact people with weapons were inflammatory, these actions by the victim did not present danger or reasonable perception of danger to the defendant).

. We note at this juncture that the district court referred repeatedly to the fact that Harris’s blow was a backhanded blow which did not cause serious damage to Lopez. If the district court considers the actual danger or damage to Lopez, it should also factor in the actual danger to Harris.

. The Presentence Report (and Judge Garwood’s opinion at 5) describes Harris's excessive behavior and apparent state of mind. Specifically, both document that other officers were procuring an alternative, nonviolent, method of restraining Lopez and told Harris that they were doing so when Harris opened the door and began striking Lopez. Officer Stacy testified that he stopped Harris from hitting Lopez because Harris had “lost his composure as a law enforcement officer.”

. PSR 1159, "Part E: Factors that May Warrant Departure.”

. We concede that the officers’ conduct in Koon was more egregious than the officer's behavior in this case. Even given the limited value of the comparison to Koon, however, the level of departure in that case is instructive.

. 891 F.2d 650.

. Id. at 652.

. In Yellow Earrings, however, the defendant was not a police officer, as is the case here.

. In arriving at Harris’s offense level of 29, the court added a 2-point enhancement pur-suanl to § 3A1.3 because Lopez was physically restrained at the time of the offense.

. 172 F.3d 347, 353 (5th Cir.1999).

. U.S.S.G. § 5H1.5 ("[e]mployment record is not ordinarily relevant in determining whether a sentence should be outside the ap *882 plicable guideline range.”). Also, Harris's clean employment record is partly accounted for in holding down his criminal history category ("CHC”) score of I.

. See supra note 3.